COUNTY OF TRINITY, a political subdivision of the State of California, by William R. Neill, its District Attorney, Plaintiff,

v.

Cecil D. ANDRUS, Secretary of the Department of the Interior, Keith Higginson, Commissioner of Reclamation, and B. E. Martin, Director of the Mid-Pacific Regional Office of the Bureau of Reclamation, Defendants,

Hoopa Valley Tribe of Indians, Plaintiff-Intervenor.

No. S–77–343–PCW.

United States District Court, E. D. California.

Oct. 13, 1977.

William R. Neill, Dist. Atty., County of Trinity, Weaverville, Cal., Harold E. Rogers, Jr., San Francisco, Cal., for plaintiff.

Gary Widman, Professor of Law, Hastings School of Law, San Francisco, Cal., Sp. Counsel, for plaintiff.

Richard W. Nichols, Chief Asst. U. S. Atty., Sacramento, Cal., for defendants.

Wesley L. Barker, Mandich, Clark & Barker, Sacramento, Cal., Richard B. Collins, Jeanne S. Whiteing, Boulder, Colo., Native American Rights Fund, for plaintiff-intervenor.

## MEMORANDUM OF OPINION

RENFREW, District Judge.[*]

Plaintiff County of Trinity filed this action for injunctive relief on June 24, 1977, alleging that the planned operation of the Trinity River Division of the Central Valley Project in response to the 1976–1977 California drought is in violation of federal law. The action arises under the Act of August 12, 1955, entitled Central Valley Project— Trinity River Division ("Trinity Act"), Pub. L.No.84–386, 69 Stat. 719; the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. § 661 et seq.; and the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq.

Plaintiff moved for a preliminary injunction and the Court heard evidence and the arguments of counsel on the motion of July 11, 1977. However, plaintiff's counsel conceded at the hearing that a preliminary injunction was unnecessary and the motion was accordingly denied. At the conclusion of the hearing, both parties agreed that no evidence remained to be presented on the merits. Accordingly, the Court ordered trial of the action on the merits advanced and consolidated with the hearing of the motion pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. In accordance with the arguments raised in its briefs and presented at the hearing, plaintiff filed an amended complaint on July 18, 1977, stating an additional claim arising from the same set of facts but based on California law, over which the Court has pendent jurisdiction. On July 29, 1977, defendants filed a supplementary memorandum setting forth their position on the amendment, to which plaintiff responded on August 10. On July 25, the Hoopa Valley Tribe of Indians moved to intervene in the action. The motion was granted on August 29, and briefs were filed, limited to the issues raised under the Trinity Act, on September 6. Having considered the evidence and the arguments of counsel for all parties, the Court concludes that judgment must be entered for defendants for the reasons set forth below.

## I. FACTUAL BACKGROUND

Plaintiff is a political subdivision of the State of California, located in the northwestern portion of the state. Within its boundaries lie the headwaters and most of the length of the Trinity River, which has historically provided an excellent habitat for large numbers of king salmon and steelhead trout. The fishery attracts numerous sport fishermen and is an economic and recreational asset of importance to plaintiff's residents. Plaintiff-intervenor is an Indian tribe occupying, pursuant to statute and executive order, approximately 150 square miles of land located along the Trinity River near its junction with the Klamath. For generations, the tribe has used the Trinity River in the practice of its religion and as a principal source of food. More recently, its members have derived substantial revenues from fishermen and other tourists attracted by the river.

Defendants, the Secretary of the Interior ("Secretary") and officials of the United States Bureau of Reclamation ("Bureau"), are responsible for the administration of a system of dams, reservoirs, canals, and hydroelectric generating plants in the State of California known collectively as the Central Valley Project ("CVP"). The unit of the CVP at issue in this action is the Trinity River Division, which was constructed and is currently administered pursuant to the Trinity Act. The relevant features of the Division are as follows. The Trinity River is impounded by Trinity Dam into Clair Engle Lake. Water is released downstream

---

[*] United States District Judge for the Northern District of California sitting by designation to the Eastern District.

from Clair Engle Lake and again impounded by Lewiston Dam, located about six miles south of Trinity Dam. From Lewiston Dam, water may be released in two ways: downstream into the Trinity River, which flows into the Klamath River and thus ultimately the Pacific Ocean; or by way of diversions and tunnels into Whiskeytown Reservoir and thence to the Sacramento River.

The Division was completed in 1963, and since that time approximately 85–90 percent of the annual historic flow of the Trinity River has been diverted to the Sacramento River to increase the water supply available in other parts of the state, principally to provide irrigation water for agriculture in the Central Valley in accordance with the statutory purposes and contractual obligations of the CVP. The remaining flow has been released into the Trinity River for fish conservation purposes. Amounts released have varied from year to year but have generally been equal to or greater than those required by the minimum monthly release schedule set forth in a 1959 agreement with the California Department of Fish and Game ("CDFG"), as modified in 1968. The agreed minimum releases total approximately 120,000 acre feet each year, and the mean total annual discharge from 1961 to 1972 has been 227,000 acre feet.[1] It is not disputed, however, that since the inception of operations the quality of the fish habitat has deteriorated, and the number of anadromous fish ascending the river to spawn each year has significantly declined.

The works of the Division made inaccessible 59 miles of king salmon and 109 miles of steelhead spawning and nursery grounds upstream from Lewiston Dam. To compensate for this loss, the Trinity River Fish Hatchery was constructed immediately below Lewiston Dam and began operations in 1963. Nevertheless, of the three major annual runs, or migrations of fish from the ocean to the spawning grounds, only the spring run of king salmon has increased. The fall run of king salmon has declined from an estimated 12,000 in the mid-1950's to an average of 6,526 returning to the hatchery in the seven-year period 1968–1975. Overall, however, the downward

1. The amounts required by the 1959 agreement, as modified, and the amounts actually released are set forth in the following table, showing the required and average actual releases in cubic feet per second on a monthly basis.

| Month | Average Pre-Project Flows, 1911–60 (cfs) | Average Post-Project Flows, 1961–72 (cfs) | 1968 Modifications of Scheduled Minimum Releases from Lewiston Dam (cfs) |
|---|---|---|---|
| October 1–15 | 302 | 218 | 200 |
| October 16–31 | | | 250 |
| November 1–15 | 742 | 248 | 250 |
| November 16–30 | | | 250 |
| December | 1,257 | 271 | 150 |
| January | 1,572 | 288 | 150 |
| February | 2,545 | 360 | 150 |
| March | 2,652 | 214 | 150 |
| April | 3,675 | 591 | 150 |
| May | 3,932 | 600 | 150 |
| June | 2,131 | 469 | 150 |
| July | 611 | 169 | 150 |
| August | 202 | 160 | 150 |
| September | 158 | 183 | 200 |
| Mean Total Discharge (acre-feet) | 1,188,000 | 227,000 | 120,300 |

Report of Felix E. Smith, attached to Plaintiff's Memorandum of Points and Authorities in Support of Injunctive Relief, filed June 24, 1977, at 4.

trend in total numbers of king salmon appears to have been reversed since 1970. The main area of concern is currently the steelhead run, which has declined drastically: from approximately 10,000 in the mid-1950's to a six-year average (1971–1976) of 215.

The precise causes of this deterioration have yet to be identified. In 1973, a CDFG biologist, Mr. Paul Hubbell, prepared an extensive report enumerating possible factors and recommending a series of studies to identify the problems and propose remedies. The Trinity River Basin Fish and Wildlife Task Force, composed of representatives of eleven federal, state and local agencies including the Bureau, was formed in 1974 to pursue those objectives. In the interim, however, the CDFG concluded that the reduced flow of water in the river was the "most likely area of suspicion." Therefore, by letter of October 24, 1973, the CDFG recommended to the Bureau that annual flows be increased on an experimental basis to a total of 315,000 acre feet, with most of the increase concentrated in the months of May and June to simulate natural snowmelt conditions.[2] A concurrent monitoring and evaluation program was also recommended with a view to reassessing the quantity and timing of releases necessary to restore the fishery. In response, the Bureau agreed to a three-year flow increase experiment and increased total flows to 245,000 acre feet in 1974 and 265,000 acre feet in 1975. The experiment was interrupted in 1976 due to the onset of drought conditions, and only 126,000 acre feet were released in that year. Although the CDFG monitored the experimental releases, the results are as yet inconclusive.

Scientists from both the CDFG and the United States Fish and Wildlife Service ("USFWS") agree, however, that some level of increased streamflow would improve fish habitat in the river.

In anticipation of a second consecutive year of below normal rainfall, the Bureau announced the CVP operating policy for the 1976–1977 water year (ending October 1, 1977) in a Dry Year Operations Policy report published in January, 1977, and amended February 15, 1977. Based on the assumption that there would be no significant precipitation after February 1st, the report as amended announced a rationing plan under which CVP users would be subject to deficiencies ranging from 25 to 75 percent depending on their contractual rights, and showing that virtually all of the reservoirs in the system would be drawn down to unprecedented lows in order to meet that level of commitment. Carryover storage in Clair Engle Lake on October 1st was projected at 200,000 acre feet, or approximately 7 percent of capacity, in contrast to the normal year drawdown of 1.8 million acre feet. A projection of 204,000 acre feet on October 1 was presented to the Trinity County Board of Supervisors on March 14, 1977. By letter of March 17, 1977, Mr. William R. Neill, the District Attorney of Trinity County, protested that plan, demanding that the Bureau retain 837,600 acre feet in the lake to provide for local usage and for a two-year reserve for fish releases. On April 7, the Bureau responded with a letter refusing to change the projected drawdown but assuring the County that the 120,000 acre feet of releases required by the 1959 agreement, as modified, would

2. The proposed increases are shown in the following table:

| Month | Recommended Average Flow * (cfs) | Acre-Feet |
|---|---|---|
| January | 200 | 12,000 |
| February | 250 | 15,000 |
| March | 300 | 18,000 |
| April | 300 | 18,000 |
| May | 1,750 | 105,000 |
| June | 1,000 | 60,000 |
| July | 300 | 18,000 |
| August | 200 | 12,000 |
| September | 225 | 13,500 |
| October | 250 | 15,000 |
| November | 275 | 16,500 |
| December | 200 | 12,000 |

Total—approximately 315,000 acre-feet per year.

*Within any given month, flows will vary according to fishery management needs.

Letter of October 24, 1973, from the CDFG to the Bureau, Exhibit A to Plaintiff's Supplemental Memorandum of Points and Authorities, filed July 7, 1977, at 3.

continue to be made and that adequate storage was being provided to meet those requirements if no significant rain fell in the 1977 or 1978 water years.

In response, the County filed this suit, setting forth two claims. First, the County alleges that the Bureau is violating a number of state and federal statutory duties that require it to release sufficient amounts of water to sustain fish populations in the Trinity River. Accordingly, the County seeks an order setting minimum releases at the amounts requested in the CDFG's letter of October, 1973. Second, it seeks an injunction barring all releases into the Sacramento River in excess of the inflow into Clair Engle Lake less the amounts released for fish preservation purposes, in order that the water level in Clair Engle Lake may be maintained pending the filing of an environmental impact statement according to the provisions of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*, on the effects of the proposed drawdown.

## II. FIRST CLAIM

Plaintiff bases its claim to increased flow releases into the Trinity River on three alternative legal theories. First, it asserts that operation in accordance with the projected schedule of releases will violate a statutory duty imposed on the defendants by the Trinity Act to preserve the fish population at pre-project levels. Even if no absolute duty can be found, plaintiff argues, the Bureau has arbitrarily refused to take appropriate action to insure the preservation of fish as required by the terms of that Act. Second, plaintiff alleges that the defendants have failed to satisfy duties of cooperation with the USFWS and the CDFG imposed by the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. §§ 661 *et seq.*; its own regulations, 43 C.F.R. Part 24; and Executive Order 11514, 35 Fed.Reg. 4247 (1970). Plaintiff-intervenor adds the Anadromous Fish Act, 16 U.S.C. §§ 757a–757f. Third, plaintiff argues that the United States has no right to divert the water in

question under California water law, which is made binding on the Bureau by Section 8 of the Reclamation Act of 1902, 43 U.S.C. § 383, and bars the diversion of any water that is "reasonably required to adequately supply the beneficial needs of the watershed," Cal.Water Code § 11460 (West 1971), or "necessary for the development of the county," Cal.Water Code § 10505 (West 1971). For the reasons set forth below, the Court concludes that plaintiff's claim for relief cannot be sustained on any of these theories, and that judgment must be entered for defendants on the first claim.

### A. *The Trinity Act*

■ The statutory standards for the operation of the Trinity River Division are set forth in section 2 of the Trinity Act:

"Subject to the provisions of this Act, the operation of the Trinity River division shall be integrated and coordinated, from both a financial and an operational standpoint, with the operation of other features of the Central Valley project, as presently authorized and as may in the future be authorized by Act of Congress, in such manner as will effectuate the fullest, most beneficial, and most economic utilization of the water resources hereby made available: *Provided,* That the Secretary is authorized and directed to adopt appropriate measures to insure the preservation and propagation of fish and wildlife, including, but not limited to, the maintenance of the flow of the Trinity River below the diversion point at not less than one hundred and fifty cubic feet per second for the months July through November * * *." Pub.L.No.84–386, 69 Stat. 719, § 2 (1955).

Plaintiff argues that the amounts of water projected for release into the Trinity River in 1977, although above the specific statutory minimum of 150 cubic feet per second July through November, are insufficient to satisfy the proviso on preservation of fish because of the history of declining steelhead and fall run king salmon popula-

tions from 1963 to 1976 under the same flow release regimen. In plaintiff's view the proviso directing the Secretary to "adopt appropriate measures to insure the preservation" of fish imposes an absolute duty to maintain fish populations at pre-project levels. No such duty can be read into the Act. The congressional mandate to "insure the preservation" of fish, on which plaintiff relies, is limited by the phrase "appropriate measures." Plaintiff reads this language as granting flexibility only as to the selection of alternative methods to achieve an inflexible, congressionally defined objective: "preservation" at historical levels. However, the word "preservation" does not refer to pre-project levels or indeed any specific level. It merely requires that some fish life be maintained. This language alone is too vague to establish any specific number of fish as a statutory standard in light of the manifest impracticality of such a course. Any such numbers could in the future become simply impossible to achieve because of factors completely unrelated to the operation of the CVP, such as overfishing or climatic changes. Thus, the selection of appropriate measures pursuant to the Trinity Act must necessarily include a determination of what levels of fish population are reasonably attainable under current environmental conditions.

Plaintiff further contends that the determination that the measures currently planned are "appropriate" within the meaning of the Trinity Act should be made *de novo* by the Court. However, the proviso on its face allocates the authority to make this determination to the Secretary, who is charged with overall responsibility for the operation of the project. This is because the questions involved are precisely the sort that call for initial decision by an administrative body. The formulation of measures for fish preservation is part of a continuing planning process which requires monitoring of ongoing operations under constantly changing conditions, as well as analysis of expert recommendations on the basis of technical expertise and familiarity with a particular geographical and subject matter

area. Absent some clear indication in the legislative history to the contrary, these factors call for administrative decisionmaking in the first instance.

There is nothing in the legislative history of the Trinity Act to suggest that either of these interpretations of the statute is in error. The few statements by members of Congress on the issue of fish preservation consist of mere restatements of the statutory language and assurances that the project had been *planned* with a view to maintaining the fishery. *See* Trinity River Project: Hearings on H.R.4663 before the House Comm. on Interior and Insular Affairs, 84th Cong., 1st Sess. 25, 41 (1955); H.R.Rep.No. 602, 84th Cong., 1st Sess. 4 (1955); Sen.Rep. No.1154, 84th Cong., 1st Sess. 4 (1955). Based on studies conducted by the USFWS and the CDFG prior to the hearings, both the Senate and the House committees took the view that the proposed diversions would consist entirely of surplus water not necessary to any conceivable development of Trinity or Humboldt counties, including fishery resources. H.R.Rep.No.602, *supra,* at 4; Sen.Rep.No.1154, *supra,* at 4. As a result, little attention was paid in the hearings to precisely what the proviso might mean at a time when there was some question as to possible harm to the fishery.

A Regional Director of the Bureau, Mr. Clyde H. Spencer, testified at the House hearings that the Bureau's operational plans contemplated making available ample water for the needs of the Trinity Basin including fish life, and that a "basic operating criterion" would be the release of the amounts of water recommended by the USFWS (and later embodied in the 1959 agreement with the CDFG) as a "first order of priority." Trinity River Project: Hearings, *supra,* at 10. However, there is no evidence that any committee member believed they were enacting that or any other specific operational plan into law, other than the 150 cubic feet per second summer minimum. The only exchange of views on the subject in the House hearings suggests that at least one member of Congress, Representative Saylor, did not believe that the

bill as written and later enacted required the Secretary to afford first priority to the release of water for fish preservation.

MR. SAYLOR: * * * I was wondering whether or not there would be any objection to seeing to it in this bill that there would be a limitation or requirement that the first degree of operation, so far as Lewiston Dam and the Trinity are concerned, is with regard to fish and wildlife, and that the first requirement be that fish and wildlife be taken care of.

"MR. SPENCER: I think we should leave that for the Commissioner or Assistant Secretary." Trinity River Project: Hearings, *supra,* at 41.

Plaintiff relies heavily on the failure of Congress to enact an amendment recommended by the Secretary that would have changed the first sentence of the proviso to read: "Provided, that the Secretary is authorized and directed to adopt * * * measures which *in his judgment,* are appropriate for the preservation * * *." H.R. Rep.No.602, *supra,* at 9 (report of the Secretary of the Interior). (Emphasis added.) No significance can be attached to this congressional inaction; it is as easily attributable to a view that the bill already gave the Secretary sufficient authority to use his judgment to select appropriate measures as to an intent to limit that discretion. Nor does the proposed amendment suggest that the Secretary interpreted the bill as written to circumscribe his discretion. The amendment was offered in conjunction with several others which would have incorporated a more extensive, year-round release schedule in the bill, and then expressly granted the Secretary power to modify it after consultation with the CDFG. The Secretary's recommendation that the grant of discretion be made more explicit in light of the inclusion of more stringent statutory requirements sheds no light at all on his interpretation of the original bill. In fact, in a subsequent report submitted to Congress after the enactment of the Trinity Act without the proposed amendments, the Secretary continued to take the view that it was his responsibility to determine what flow release modifications might be necessary for fish preservation after future study. Report of the Secretary of the Interior, H.R.Doc.No.281, 84th Cong., 2d Sess. (1955).

Since the legislative history gives no indication of any intent to depart from the plain language of the Act, the Court concludes that regardless of the evidence of deterioration of the fishery, the initial determination as to what, if any, steps need be taken to correct it must be made by the Secretary of the Interior. The Trinity Act makes no specific provision for judicial review; and the Secretary is clearly an "agency" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(b)(1). Thus, his decision to terminate the increased flow release experiment and resume the 120,000 acre foot schedule is reviewable only according to the provisions of that Act, 5 U.S.C. §§ 701–706. Two issues are presented: First, is the decision "committed" to the Secretary's discretion by the Trinity Act so as to preclude judicial review under Section 10 of the APA, 5 U.S.C. § 701(a)(2)? Second, may the decision be overturned under the standard of review prescribed by Section 10(e), 5 U.S.C. § 706? The Court concludes that although review is available, the decision must be upheld.

*1. Availability of Review*

Under the APA, no judicial review is available "to the extent that" action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This provision is limited, however, by the inclusion in the APA of another section providing that a reviewing court shall set aside agency action found to be an "abuse of discretion." 5 U.S.C. § 706(2)(A). Thus, the fact that a decision "involves" discretion need not mean that it is wholly immune from review. The issue is whether the authorizing statute so far "commits" the decision to agency discretion as to entirely preclude review, even for abuse. *Hi-Ridge Lumber Co. v. United States,* 443 F.2d 452, 454 (9 Cir. 1971); *Bronken v. Morton,* 473 F.2d 790, 794 (9 Cir.), *cert. denied,* 414 U.S. 828, 94 S.Ct. 51,

38 L.Ed.2d 62 (1973); *Western Addition Community Organization v. Weaver,* 294 F.Supp. 433, 442 (N.D.Cal.1968). Nonreviewability under this section is a "very narrow exception" to the general presumption favoring review under the APA. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). It is applicable only in "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* The Court of Appeals for the Ninth Circuit has held that under this test the availability of review turns on the type of issue to be decided.

"Where consideration of the language, purpose and history of a statute indicate that action taken thereunder has been committed to agency discretion: (1) a federal court has jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of constitutional, statutory, regulatory or other legal mandates or restrictions; (2) but a federal court does not have jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion consists only of the making of an informed judgment by the agency." *Ness Inv. Corp. v. United States Dept. of Agriculture,* 512 F.2d 706, 715 (9 Cir. 1975).

The difficulty in applying this standard is that here the Secretary's allocation of water is challenged as outside the "legal mandate" of the Trinity Act because of a failure to take "appropriate" measures to insure fish preservation; yet the determination of appropriateness is a matter for the "informed judgment" of the Secretary. In such cases courts have generally examined the language and legislative history of the authorizing statute, and have found the necessary "legal basis" for review of the exercise of agency discretion, *Strickland v. Morton,* 519 F.2d 467, 468 (9 Cir. 1975), whenever it is apparent that Congress intended to set judicially enforceable limits. *See, e. g., Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 411–413, 91 S.Ct. 814; *Arizona Power Pooling Association v. Morton,* 527 F.2d 721, 727 (9 Cir.

1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *East Oakland—Fruitvale Planning Council v. Rumsfeld,* 471 F.2d 524, 534–535 (9 Cir. 1972). This inquiry must be conducted in light of the Supreme Court's repeated admonitions that the APA review provisions must be given a "'hospitable' interpretation," *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and that the law favors judicial review rather than administrative absolutism unless a contrary purpose is "fairly discernible in the statutory scheme." *Data Processing Service v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 832, 25 L.Ed.2d 124 (1970). *See Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969); *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 140, 87 S.Ct. 1507.

In *Citizens to Preserve Overton Park v. Volpe, supra,* the Secretary of Transportation had authorized the use of federal funds for a highway through a park under a statute banning such authorization unless, *inter alia,* there was no "feasible and prudent" alternative route. The Supreme Court held there was law to apply, rejecting the argument that the requirement that there be no other "prudent" route endowed the Secretary with unreviewable discretion to balance the destruction of parkland against cost, safety and other factors. Finding the legislative history ambiguous, the Court reasoned that the statute protecting parkland would have no meaning if all factors were to be considered on an equal footing. The very existence of the statute indicated a preference for parkland which provided sufficient "law" for a reviewing court to apply. 401 U.S. at 411–413, 91 S.Ct. 814. Similarly, in this case, the broad mandate to determine "appropriate" measures for the preservation of fish cannot be read as providing unlimited discretion to balance the value of the fishery against the needs of agricultural and other users of the CVP. Here, as in *Overton Park,* the proviso would be meaningless if it did not limit the Secre-

tary's discretion in following the general operational directive to "effectuate the fullest, most beneficial, and most economic utilization of the water resources" made available by the Trinity Division. Trinity Act, Section 2. Although the legislative history is inconclusive,[3] the existence of the proviso in itself indicates a congressional intent to set some lower limit on the Secretary's discretion to operate the Division to the detriment of the fishery.

Faced with a similar statutory pattern, the Court of Appeals for the Ninth Circuit held reviewable a decision by the Secretary of the Interior with respect to the sale of power from the Central Arizona Project, a reclamation project similar to the CVP. *Arizona Power Pooling Association v. Morton, supra,* 527 F.2d 721. There, as here, a general provision appeared to give the Secretary virtually unlimited discretion to coordinate project operations by directing him to prepare the "most feasible plan" for the provision of power. 43 U.S.C. § 1523(a). A proviso limited that discretion by directing the Secretary to give preference to sales to public agencies unless "in the judgment of the Secretary" it would "impair the efficiency of the project for irrigation purposes." 43 U.S.C. § 485h(c). Despite the express delegation to the Secretary's judgment and the potential ambiguities in defining "impairment" of project efficiency, the court found that the exception to the proviso established a specific limit on the Secretary's discretion, which was thus reviewable for abuse. 527 F.2d at 727–728.

Defendants contend that the word "appropriate" does not provide a sufficiently specific standard for a court to apply. The question is not, however, the enforceability of the standard in the abstract, but rather whether the plaintiff has in this case raised separable issues appropriate for judicial determination. *National Forest Preservation Group v. Butz,* 485 F.2d 408, 411 (9 Cir. 1973). Review is precluded only when the agency action complained of "fails to raise a legal issue which can be reviewed by the court by reference to statutory standards

and legislative intent." *Strickland v. Morton, supra,* 519 F.2d at 470.

Both *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, and *Arizona Power Pooling Association v. Morton, supra,* 527 F.2d 721, demonstrate that a complaint may raise a "legal issue" even where the statutory standard on its face is vague and requires the exercise of judgment. *See also East Oakland—Fruitvale Planning Council v. Rumsfeld, supra,* 471 F.2d at 532, 534–535 (statute conditioning action on agency finding that a plan is "fully consistent with the provisions and in furtherance of the purposes" of the law held to place judicially enforceable limit on agency discretion by restricting factors properly considered by agency); *Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29, 35 (3 Cir. 1976); *Western Addition Community Organization v. Weaver, supra,* 294 F.Supp. at 442 (decisions pursuant to statutes authorizing agency action upon "satisfactory assurances" of a particular fact held reviewable for arbitrariness and reasonable factual basis). Under these authorities, the issue raised by plaintiff's allegation that the Bureau has arbitrarily failed to take the "appropriate" action required by statute cannot be held so indeterminable as to preclude judicial review in the face of a clear congressional intent to place some limits on agency discretion.

Finally, none of the practical difficulties which have occasionally been held to make judicial review inappropriate are applicable here. Three factors are relevant to the feasibility of review: first, the appropriateness of the issues raised for determination by a court in light of the need for agency expertise; second, the impact of review on the effectiveness of the agency in carrying out its assigned tasks; and third, the need for and effectiveness of judicial supervision as a safeguard for the interests of the plaintiff. *See Hi-Ridge Lumber Co. v. United States, supra,* 443 F.2d at 455; *Hahn v. Gottlieb,* 430 F.2d 1243, 1249 (1 Cir.

---

**3.** See discussion at pp. 1375–1376, *supra.*

1970); Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367, 371 (1968). Here, the determination of appropriate measures to insure the preservation of fish clearly calls for the application of expertise. However, the limited issue for judicial review is not the absolute appropriateness of the measures chosen, but merely whether the choice exceeded statutory authority or was arbitrary, capricious, or an abuse of discretion. It is an appropriate judicial function to interpret the statute in light of its legislative history and determine whether those limits have been exceeded in this case. The decision challenged here is part of an ongoing management program but is not a matter of day to day operations, review of which is likely to seriously disrupt agency functions. Rather, it is a single, annual, major policy decision which is unlikely to be impeded by the institution of more formal decisionmaking procedures. Finally, there is here no agency appeal process by which the plaintiff can have its protest heard in a fair and expeditious forum. Nor is there any indication that the availability of judicial review would hamper plaintiff's ultimate interest by delaying or causing friction within a process on which it must rely.

For all these reasons, judicial review in the instant case is consistent with recent cases in which the Ninth Circuit has declined to review resource management decisions,[4] as well as with this Circuit's position that courts should not be quick to review "allegations that an agency abused its discretion merely by deciding an issue, involving agency expertise, adversely to a complaining party." *Ness Inv. Corp. v. United States Dept. of Agriculture, supra,* 512 F.2d at 714.

## 2. Review of the Secretary's Decision

■ Although the Court is thus empowered to review the Secretary's decision not to increase releases on the Trinity River, the scope of review is limited by the APA, 5 U.S.C. § 706(2).[5] No failure to observe procedures required by law, § 706(2)(D), or

---

**4.** In *Strickland v. Morton, supra,* 519 F.2d 467, the language of the statute in question much more emphatically granted the Secretary of the Interior complete discretion to classify land for disposal or retention in federal ownership. Indeed the Court described the provision as "breath[ing] discretion at every pore." 519 F.2d at 469. *Ness Inv. Corp. v. United States Dept. of Agriculture, supra,* 512 F.2d 706, involved the granting of a forest service special use permit under a statute which required no action whatsoever—all authority was permissive. *See Ferry v. Udall,* 336 F.2d 706, 712 (9 Cir. 1964), *cert. denied,* 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965); *United States v. Walker,* 409 F.2d 477, 480 (9 Cir. 1969). Moreover, the statute specifically stated that permits were to be issued under such regulations "as [the Secretary] may make and upon such terms and conditions as he may deem proper." 512 F.2d at 715. Finally, a forest service decision to reject all bids on the sale of timber was held unreviewable in *Hi-Ridge Lumber Co. v. United States, supra,* 443 F.2d 452. The statute there provided no standard at all on which to base review of the determination, and did provide an appeal procedure which the Court found to supply an adequate forum for the full consideration of protests such as the plaintiff's.

**5.** Section 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

"(1) compel agency action unlawfully withheld or unreasonably delayed; and

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

"(B) contrary to constitutional right, power, privilege, or immunity;

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(D) without observance of procedure required by law;

"(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**1380**

violation of constitutional rights, § 706(2)(B), has been alleged. Plaintiff appears to rely chiefly on § 706(2)(C), asserting that the Bureau's decision was in excess of its statutory authority. Where, as here, a statute grants an agency official discretion to act within a range of alternatives, his decision can be overturned under this subsection only if he has misconstrued the range of choices available or on the facts could not reasonably have believed that the action was within that range. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. 814; *Gulf Oil Corp. v. Morton,* 493 F.2d 141, 144 (9 Cir. 1973).

■ The Trinity Act confines the Secretary's range of choices on the allocation of Trinity River water by requiring him to adopt "appropriate measures" for fish conservation. The Secretary has plainly recognized that limitation and adopted measures he believes to be appropriate in light of drought conditions. However, plaintiff contends that the language according such measures a priority over other uses of the water also imposes a duty to select the most appropriate water release schedule for the purpose of fish preservation without regard to the effect of such releases on the CVP generally. It was therefore inappropriate, in plaintiff's view, for the Secretary to balance the overall demand for CVP water and the needs of other users against the interests of the fish as represented by CDFG and USFWS recommendations. Nothing in the language, structure, or legislative history of the Trinity Act supports this result. In light of the principal purpose of the Act—"increasing the supply of water available for irrigation and other beneficial uses in the Central Valley of California" (section 1)—Congress could not reasonably have intended that the Secretary consider the question of appropriate measures for fish conservation in isolation from the management practices of the CVP as a whole. In the absence of any clear indication in the legislative history, the Court cannot read the Act as requiring an agency to divorce one aspect of a complex operating program from all others in its planning process. Such a course could result in needless waste and inconsistencies in management. Moreover, the imperative of fish preservation, considered alone, might conceivably lead to the plainly unintended result that the Secretary would be required to allocate all Trinity River water to fish releases, and import additional water for that purpose as well.

Plaintiff-intervenor urges that defendants have misconstrued their authority by adopting the opposite policy: planning for operations without considering the interest in fish preservation, and treating the need for increased flows for that purpose as strictly secondary to the needs of other users. If established by the evidence, such subordination may violate the statutory proviso, which clearly imposes a duty to consider the needs of the fish and to adjust operations, including the amounts of water allocated to other users, where it is appropriate to do so. A refusal to consider such adjustments in light of the needs of the fish would fall outside the range of authority granted by the statute. However, the only indication in the record cited by plaintiff-intervenor in support of its contention that this has been the Bureau's policy is a statement in the affidavit of Ernest N. Sasaki, Chief of the Bureau's Northern Branch, Division of Planning, Mid-Pacific Region, filed July 7, 1977, at 3, to the effect that the increased releases in 1974 and 1975 were made at a time when above-normal rainfall made water available in excess of project needs. This statement does not necessarily suggest that the Bureau would not have made such releases in a normal year, nor is it sufficient to establish that the Bureau operates under a policy of automatic subordination. In the absence of further evidence, the Court cannot find that the Act has been violated on this ground.

Thus, the evidence fails to show that the Bureau incorrectly construed either its duty or its authority under the Trinity Act. Since that authority includes the authority to make releases in amounts less than those requested by the CDFG when the needs of the project so require, the Secretary's decision cannot be overturned under section 706(2)(C).

■ The only remaining question is the substantive correctness of the Secretary's decision not to adopt the recommended flows, which can be set aside only if it is found "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Lathan v. Brinegar*, 506 F.2d 677, 692–693 (9 Cir. 1974); *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 415, 91 S.Ct. 814.[6] Under this standard the Court is limited to deciding

> "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. * * * Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 824.

Plaintiff must overcome the presumption of administrative validity. *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 185–186, 56 S.Ct. 159, 80 L.Ed. 138 (1935); *United States v. Chemical Foundation*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *Pennsylvania Environmental Council, Inc. v. Bartlett*, 454 F.2d 613, 619 (3 Cir. 1971). As long as a rational basis exists, or may reasonably be discerned, for the decision, it must be upheld. *Bowman Transportation v. Ark.—Best Freight System*, 419 U.S. 281, 285–286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

Plaintiff has manifestly failed to sustain its burden of establishing the illegality of the Secretary's action under this standard. The County relies principally on an assertion that the Bureau has simply ignored the concerns voiced by the CDFG and the USFWS as to the condition of the fishery, as well as the CDFG's request for experimental flow releases. Yet the uncontroverted testimony of Bureau officials plainly establishes a record of voluntary cooperation in efforts to identify the causes of the decline in fish population and of participation in actions to remedy known problems. Flows were increased in response to the CDFG request in 1974 and 1975. Although the increases fell short of the amounts requested by 70,000 acre feet, or 22 percent, in 1974 and by 50,000 acre feet, or 16 percent, in 1975, it nowhere appears that the CDFG was dissatisfied with this response. In addition to its formal participation in the Trinity River Basin Fish and Wildlife Task Force, the Bureau has acted pursuant to Task Force programs to improve fish habitat by pool and riffle restoration efforts, water quality control studies, and the establishment of multi-level dam outlets. In view of this record, it can hardly be said that the Bureau has arbitrarily ignored the problems of the fishery altogether.

In light of this record and in the context of the demands placed on the entire CVP by a drought emergency which poses a serious threat to numerous aspects of the state's economy, the specific decision to terminate the flow release experiment and to release the previously agreed annual minimum of 120,000 acre feet for the duration of the drought cannot be found arbitrary, capricious or an abuse of discretion. First, there is no evidence to suggest that the Bureau failed to consider the relevant factors, including recommendations and reports prepared by wildlife conservation officials setting forth extensive data on the problem. Mr. David Schuster, Chief of the Water Operations Branch of the Central Valley Operations Coordinating Office, testified that such considerations were a part of the Bureau's normal decisionmaking procedures, and his testimony was confirmed by the affidavit of Mr. B. E. Martin, filed July 29, 1977, at 1, 5. Mr. Martin further attests that both the maintenance of minimum releases through the 1978 water year and the

---

6. Since the decision was not made on the record after hearings, it does not trigger the "substantial evidence" test of § 706(2)(E). Nor is this Court free to review the decision *de novo* under § 706(2)(F) and determine whether the agency action was "unwarranted by the facts," since the plaintiff neither alleges inadequate factfinding procedures nor seeks to enforce agency action. *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 415, 91 S.Ct. 814; *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

request of the CDFG for additional releases were considered in the decisionmaking for water year 1977. *Id.* at 5–6.

Second, the decision itself was plainly within the bounds of reasonableness. None of the studies or recommendations cited by plaintiff has been able to quantify the actual amounts of water appropriate for the preservation and propagation of fish. Rather, each concludes that the precise causes of the decline in populations are unknown, and that extensive study is necessary to identify the causes and specify the necessary remedial action. Representatives of both the CDFG and the USFWS testified at the hearing that these conclusions are still valid today. Indeed, it is clear that flow releases of the recommended magnitudes would do nothing to remedy the following problems which, among others, have been listed as contributing to the decline in the fishery: (1) increases in silt and sedimentation resulting from road building and logging activity as well as the absence of large spring "flushing flows"; (2) riparian vegetation encroachment; (3) habitat changes caused by floods; (4) loss of spawning habitat in the Upper Trinity not adequately replaced by the hatchery because of a variety of problems; (5) overcrowding and predation among hatchery-produced fish.[7] In short, although there is no dispute that some amount of additional water would benefit the fish, in essence the plaintiff asks that the Bureau be required to

continue an experiment promising no certain present benefit in order to determine what amounts and what timing of releases may be appropriate in the future. Perhaps the most beneficial schedule could be determined at an earlier date if the experiment were continued now. However, in deciding whether such continuation was appropriate, the Secretary was entitled to consider that uncertain and indefinite potential benefit in light of the immediate adverse effects of reducing the supply of Trinity River water available to other CVP users.

Defendants have submitted no specific information on the consequences of the loss to the CVP of the water that plaintiff seeks for fish preservation purposes alone. However, the affidavit of Mr. Schuster provides an uncontroverted estimate of the losses that would result if all diversions from the Trinity to the CVP were stopped on July 1, 1977, as requested in plaintiff's second cause of action.[8] Even a small fraction of those potential losses would be sufficient to justify the Secretary's decision to postpone further fish release experimentation upon a charge of arbitrariness or abuse of discretion. The gravity of the situation is underscored by the provisions of an Act passed April 7, 1977, and entitled "Emergency Action—1976–1977 Drought." Pub.L.No.95–18, 91 Stat. 36. Effective immediately, that Act grants the Secretary emergency authority to undertake management activities in the operation of federal reclamation

**7.** The sedimentation and vegetation problems are at least in part attributable to decreased flows in comparison with pre-project conditions. However, no one currently recommends that the "flushing flows" that controlled these problems in the past be used to eliminate them now, because of the danger to structures built on the flood plain in the interim.

**8.** Based on the hypothesis that 518,000 acre feet of water would be lost to the CVP, Mr. Schuster estimated that a program of reduced deliveries to CVP customers could result in economic harm due to crop loss on the west side of the Sacramento Valley in the amount of $30,000,000; serious hardship and potential shutdowns of industrial users in Contra Costa County; and the intrusion of saline water into the Sacramento/San Joaquin Delta. If, in the alternative, reduced storage in other CVP reservoirs was the method selected for compen-

sating for the loss of Trinity River water, a serious reduction in power production from the CVP at a possible replacement cost to Pacific Gas and Electric Company of $18,500,000 was predicted, as well as an early loss of recreation on Shasta and Whiskeytown Lakes with concomitant economic loss to those regions. Of these losses, plaintiff disputes only the crop loss on the west side of the Sacramento Valley on the ground that the crops there planted are cotton, which is in excess supply and costs the United States additional money to buy. Although this argument may testify to the lack of wisdom of federal agricultural policy, it does nothing to alleviate the undeniable economic loss to the farmers themselves, who had planted cotton as the crop most appropriate to the reduced water allocations announced in February.

projects to mitigate losses and damages caused by the drought.[9] Although the Act expressly disclaims any modification of existing laws, Section 11, it states a policy that supports the Bureau's position: The Trinity Act cannot under current conditions reasonably be interpreted to require an increase in the releases scheduled pursuant to the 1959 agreement for purposes of experimentation.

## B. *The Fish and Wildlife Coordination Act and Related Provisions*

Plaintiff's second contention, that the failure to increase flow releases must be overturned as "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because defendants have not cooperated with the USFWS and the CDFG as required by the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. §§ 661 et seq., is wholly unfounded. First, no private right of action arises under this statute. *Sierra Club v. Morton,* 400 F.Supp. 610, 640 (N.D.Cal.1975); *Environmental Defense Fund v. Corps of Engineers,* 325 F.Supp. 749, 754 (E.D.Ark.1971). Any failure to comply with the Fish and Wildlife Coordination Act may be raised in plaintiff's second claim, attacking the adequacy of compliance with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq. *Id.* Second, the record reflects continuing concern and action on the part of the Bureau which satisfy the cooperation and coordination requirements imposed by the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661 and 662; and the Bureau is administering the use of waters for wildlife conservation purposes in accordance with plans approved by the head of the CDFG as required by 16 U.S.C. § 663(b). Nothing in the record indicates that the CDFG has officially withdrawn its approval of the 1959 agreement, as modified, or that the head of that agency has insisted that the agreement be changed despite the current drought.

Similarly, the Bureau is in full compliance with its own regulations, 43 C.F.R. Part 24 (1976), which set forth in detail policies and procedures for cooperation. Under the regulations cooperative agreements with state agencies must be reviewed periodically and "when appropriate adjusted to reflect changed conditions." 43 C.F.R. § 24.6 (1976). Plainly, the decision as to when adjustments are appropriate is within the Secretary's discretion, and must be upheld for the reasons stated above.

The Anadromous Fish Act, 16 U.S.C. §§ 757a–757f, cited by plaintiff-intervenor, provides even less support for relief in this case, since it merely authorizes the Secretary to enter into cooperative agreements with the states for the conservation of anadromous fish. Although this statute may reaffirm the importance of the Secretary's duty under the Trinity Act, Congress' failure to mandate any particular actions leaves the determination as to what is to be done pursuant to its terms entirely within the Secretary's discretion.

Finally, there is no evidence of any violation of Executive Order 11514, 35 Fed. Reg. 4247 (1970). Nothing in that order requires the Bureau to take any specific action to cooperate with wildlife officials, and for the reasons outlined above, the plaintiff has on this record failed to show any violation of the general directives to monitor, evaluate, and control Bureau activities to protect and enhance environmental quality and to consult with appropriate agencies in carrying out activities that affect the environment. Exec.Order 11514, § 2(a).

## C. *California Law*

Plaintiff argues that California law bars the diversion of the water requested for Trinity River fish releases on two grounds. First, plaintiff contends that the United States never acquired the right to appropriate such water under the instru-

---

**9.** The losses and damages referred to are the potential *economic* losses and *social* disruption that will potentially occur as a result of inadequate *irrigation* water supplies for the *crop* *year of 1977.* H.Rep.No.95–155, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin. News 1977, p. 521 (emphasis added).

ments governing the acquisition. Under California statutes, rights to appropriate water may be acquired only by applying for and obtaining a permit from the California Water Resources Control Board (until 1967 the State Water Rights Board). Cal.Water Code § 1225 (West Supp.1977). If a permit is ultimately granted, the priority of the right dates from the filing of the application. Cal.Water Code §§ 1450, 1455 (West 1971). In anticipation of major development of water resources by the state, the legislature in 1927 authorized the Department of Finance to file applications and thus obtain immediate priorities on unappropriated waters which might be needed for such development. See Cal.Water Code § 10500 (West Supp.1977). Such filings were made covering the water in question here. When, in 1957, it became apparent that the United States would construct the Trinity River Division in conformity with the state plan of development, the Department of Water Resources (to which the relevant functions of the Department of Finance had been transferred) assigned the state-filed applications, with their early priorities, to the United States. Pursuant to section 10505 of the Water Code (West 1971), which bars any assignment that will, in the judgment of the agency, deprive the county of origin of water necessary for its development, the assignment was expressly made subject to "the prior rights of the county in which the water sought to be appropriated originates to use such water as may be necessary for the development of the county." Assignment of Applications Nos. 5627 and 5628, Exhibit A to Plaintiff's Memorandum filed August 10, 1977, at 3. In 1959 the Water Rights Board approved these and other federal applications for water in the Trinity Basin, and ordered permits issued subject to a number of conditions, including a reservation in favor of the county of origin identical to that contained in the assignment. Permit Order No. 124, State Water Rights Board, dated Sept. 10, 1959, at 7. Because the Bureau's priority with respect to the use of this water depends on these instruments, plaintiff argues that it never acquired and cannot now as-

sert priority over the rights of Trinity County to the use of water necessary for the development of the county, in this case principally the preservation of fish.

Second, plaintiff relies on the Watershed Protection Act, which limits the powers of the Bureau as operator of the project by prohibiting it from depriving a watershed or adjacent area of "the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed area, or any of the inhabitants or property owners therein." Cal.Water Code § 11460 (West 1971).

A threshold question is the extent to which either of these state-created restrictions is binding on the United States. The parties agree that under the Supremacy Clause, U.S.Const., Art. VI cl. 2, and because of the national implications of reclamation of arid lands, Congress could have reserved all powers over federal reclamation projects to the federal government. The dispute concerns the extent of the role preserved for state law by the Reclamation Act of 1902, pursuant to which the Secretary must act in operating the Trinity River Division. Trinity Act § 1. Section 8 of the Reclamation Act provides:

> "Nothing in [the Act] shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of [the Act], shall proceed in conformity with such laws  *  *  *." 43 U.S.C. § 383 (1970).

Although this section on its face appears to require virtually unlimited deference to state water law, a series of decisions construing it have significantly narrowed its applicability. State law defines the rights for which compensation must be paid when the United States acquires water rights for use in reclamation projects. *City of Fresno v. California,* 372 U.S. 627, 630, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963). But once those rights are acquired, the state cannot compel dispo-

sition of the water or operation of the project on terms or according to priorities which conflict with those specifically prescribed by Congress. *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 291–292, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); *see Arizona v. California,* 373 U.S. 546, 587–588, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). Nor can the state use its power over the acquisition process to control subsequent operations by granting permits subject to terms and conditions relating to the control, development, or operation of the project. *United States v. State of California,* 403 F.Supp. 874, 902–903 (E.D.Cal.1973), *aff'd* 558 F.2d 1347 (9 Cir. 1977). Thus, when the United States applies to the California State Water Resources Control Board for a permit to appropriate water, the Board is required to grant the permit if unappropriated waters are available. *United States v. California, supra,* 558 F.2d at 1351.

Here, plaintiff seeks to assert priorities which were, at the time the applications were assigned and the permits granted, present inchoate rights to priority over the United States, as operator of the project and assignee of the state filings, upon the occurrence of certain future events. According to the California Attorney General, those rights were not then susceptible to acquisition by purchase, condemnation, or otherwise. See 25 Op.Cal.Atty.Gen. 8, 22–23 (1955). Whether or not section 8 requires the United States to respect state law barring the acquisition of rights under these circumstances, *see City of Fresno v. California, supra,* 372 U.S. at 630, 83 S.Ct. 996, it is not disputed that no effort was made to acquire the rights in question here. Consequently, the holdings of *Ivanhoe Irrigation Dist. v. McCracken, supra,* 357 U.S. at 291–292, 78 S.Ct. 1174, and *Arizona v. California, supra,* 373 U.S. at 587–588, 83 S.Ct. 1468, with respect to the disposition of water, once rights have been acquired, are inapplicable here. Even if those cases establish the broader proposition that specific congressional directives with respect to acquisition as well as disposition of water will override the section 8 obligation to follow state law, the Trinity Act's delegation of

authority to the Secretary to determine appropriate measures for fish preservation is insufficiently specific to supersede state-created rights consistent with that federal duty. The mere grant of authority, not accompanied by any language expressly precluding reliance on other rights with respect to the same subject matter, *see Arizona v. California, supra,* 373 U.S. at 561, 83 S.Ct. 1468, does not evidence a congressional intent that the Secretary is to ignore state law in carrying out his mandate.

Nor does *United States v. California, supra,* 558 F.2d 1347, require invalidation of the assignment and permit conditions reserving the rights of the county of origin pursuant to Cal.Water Code § 10505, *supra.* These conditions in effect embody a determination by the State Water Rights Board that the waters defined by their terms were subject to a prior right to appropriation in the future and thus were not "unappropriated waters." Such waters were properly excludable from the rights granted to the United States.

Although plaintiff's substantive rights have thus been preserved against acquisition by the United States and cannot now be disregarded by the Bureau, the unmistakable import of the line of authority discussed above is that state agencies may not guard such rights by means of permit conditions or other enforcement devices which interfere with the operation and control of federal facilities. *See also Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976); *Environmental Protection Agency v. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *Turner v. Kings River Conservation District,* 360 F.2d 184, 198 (9 Cir. 1966). To permit the state to enforce the duty, imposed on the Secretary by section 8, to respect and preserve the rights of watershed areas and counties of origin, would require state involvement and control of a significant portion of the Bureau's operational planning on a yearly basis. Accordingly, the authority to enforce such rights must be vested in the Secretary alone, and only the Secretary has the au-

thority—subject to judicial review—to determine whether the waters in question here fall within Trinity County's priority as defined by California law.[10]

Defendants assert that plaintiff has no present rights cognizable by the Bureau in its decisionmaking process. In their view, plaintiff's priority rights remain inchoate because plaintiff has not acquired the rights to use the water which are prerequisites to the assertion of priorities under both the County of Origin and the Watershed Protection Acts. 25 Op.Cal.Atty.Gen. 8, 20–21 (1955); 26 Op.Cal.Atty.Gen. 81, 82–83. Plaintiff admits that it has failed to comply with the procedures for establishing appropriative rights, but argues that this is not necessary when no water is to be diverted from the stream. Instead, plaintiff relies on other types of rights which it asserts may be perfected without recourse to the permit procedure. However, it is unnecessary to resolve the complex questions of state law raised by this dispute. Assuming arguendo that rights to use the water have been perfected, the record shows that the Bureau did consider the only need of the county asserted here—the restoration of fish populations—and properly concluded that increased flows for that purpose were not justified under present circumstances. See Part I, A, 2, supra.

Although the Bureau made no findings on the factual issues determinative of plaintiff's priority rights under state law, the evidence relevant to those issues is manifestly insufficient to establish that the refusal to recognize the priorities asserted was unreasonable. First, there has been no showing, either in papers submitted to the Bureau or in evidence presented to this Court, that increased water is "necessary for the development" of Trinity County. The Court agrees with plaintiff that "development" must include restoration of pre-project uses as well as expansion into new or additional uses. But plaintiff has failed to show that the decrease in fish populations has resulted in any decrease in tourism or recreational use, or that increased fish populations would enhance development for this purpose. Indeed, the angling pressure on the river has increased since project construction. Plaintiff has attempted to explain this phenomenon by testimony that the pre-project "army" of fishermen has been reduced to a "patrol" of hardcore individuals. Yet there is no evidence to support a finding that more intensive use by fewer individuals has impaired the development of resorts or other facilities for fishermen.

Since recreation and the preservation of fish are "beneficial uses" of water independent of the income derived therefrom, Cal. Water Code § 1243 (West Supp.1977), the Watershed Protection Act appears to require the Secretary to provide any water "reasonably required to adequately supply" the needs of the watershed area for those purposes regardless of the impact on development. If plaintiff could demonstrate the amounts of water necessary to increase fish populations, this provision might well require that those amounts be released. However there would have to be a showing that the releases were "reasonably required." [11] Under normal conditions releases for experimentation with water levels could well meet this standard. But at a

---

10. A few statutes authorizing the construction of CVP units have specifically directed the Secretary to give priority to the needs of the area of origin. 43 U.S.C. § 616eee (Auburn-Folsom South Unit); River and Harbor Act of 1962, Pub.L.No.87–874, § 203, 76 Stat. 1173, 1191 (New Melones Project). Defendant argues that these provisions suggest that Congress believed that compliance with these laws would not otherwise be required. However, it would be absurd to suppose that Congress intended to create a patchwork of compliance and noncompliance with these laws within the CVP. It is more reasonable to assume that these provi-

sions simply gave express recognition to the scheme implicit in earlier enactments such as the Trinity Act: mandatory compliance to be enforced by the Secretary alone.

11. This limitation is reinforced by a constitutional provision barring the extension of rights to any "unreasonable use" of water, and mandating the conservation of state waters "with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." Cal.Const. Art. 10 § 2 (West Supp.1977).

time when water is in drastically short supply and experts are unable to predict that the amounts requested will actually have any beneficial effect, the County can claim no right to water for purposes of experimentation.

## II. SECOND CLAIM

■ In its second claim, plaintiff seeks an order enjoining any further drawdown of Clair Engle Lake until an environmental impact statement has been prepared in accordance with the provisions of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. The County argues that a drawdown to the 200,000 acre foot level, or seven percent of capacity, is a "major federal action significantly affecting the quality of the human environment" within the meaning of section 102(2)(C) of NEPA, 43 U.S.C. § 4332(2)(C), and thus cannot be undertaken prior to the completion of an EIS.[12] At oral argument, counsel for plaintiff further contended that the reduced schedule of releases into the Trinity River constituted such action, and that to proceed according to present plans for those releases is also a violation of NEPA.

The short answer to these contentions is provided by a statute passed April 7, 1977, entitled "Emergency Action—1976–1977 Drought," Pub.L.No.95–18, 91 Stat. 36, which waives the requirement of an EIS for all actions taken pursuant to its provisions.

"Sec. 5. Actions taken pursuant to this Act are in response to emergency conditions and depend for their effectiveness upon their completion prior to or during the 1977 irrigation season and, therefore, are deemed not to be major Federal actions significantly affecting the quality of the human environment for purposes of the National Environmental Policy Act of 1969 * * *."

Both the proposed drawdown and the 1977 schedule of releases are actions "taken pursuant to the Act" under section 1(a), which directs the Secretary,

" * * * consistent with existing contractual arrangements, and State law, and without further authorization, to undertake construction, management and conservation activities which can be expected to have an effect in mitigating losses and damages to Federal reclamation projects and Indian irrigation projects constructed by the Secretary resulting from the 1976–1977 drought period * * *."

The actions in question are management activities which make additional water available to CVP users and reduce the demands on other reservoirs within the project. Thus, they can certainly be expected to have some effect in mitigating losses and damages to the CVP. Both will

12. Section 102 provides in relevant part:
"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
* * * * * *
"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
"(i) the environmental impact of the proposed action,
"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
"(iii) alternatives to the proposed action,
"(iv) the relationship between local short-term uses of man's environment and the

maintenance and enhancement of long-term productivity, and
"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes". 42 U.S.C. § 4332.

be completed before the authorities conferred by the Act terminate, on September 30, 1977. Section 8(c). Plaintiff's contention that authority under the Act will cease earlier, at the end of the 1977 irrigation season in mid-August, is unfounded. The reference to the irrigation season in section 5 is simply declaratory of the need for urgent action and does not in any way condition either the grant of authority or the waiver of the requirements of NEPA.

Since all authorities pursuant to the Act terminate on September 30, however, plaintiff at oral argument urged that the Court order defendants to prepare an EIS covering future drawdowns and releases into the Trinity River. There is no question that if section 102(2)(C) applies to the actions in question, such an order would be appropriate, and defendants do not appear to dispute that the actions significantly affect the environment. The only issue is thus whether operation within the originally authorized limits of an ongoing project which was constructed prior to the effective date of NEPA, January 1, 1970, constitutes "major federal action" within the meaning of section 102(2)(C).

■■■■■■ The question of the applicability of NEPA to a particular action is generally for the agency responsible for the project to decide in the first instance, subject only to limited judicial review under the APA. *E. g., City of Davis v. Coleman,* 521 F.2d 661, 673 (9 Cir. 1975); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5 Cir. 1973). However, limited review is appropriate only in cases involving factual questions or mixed questions of fact and law, such as whether an action has significant effects on the environment, or whether it is "major" in the sense of "significant," which generally amounts to the same question. *See City of Davis v. Coleman, supra,* 521 F.2d at 673 n. 15. The issue here is not whether the actions are of sufficient magnitude to require the preparation of an EIS, but rather

whether NEPA was intended to apply at all to the continuing operations of completed facilities. This is purely a matter of statutory construction and thus a question of law for the Court to consider *de novo.* 5 U.S.C. § 706 (introductory paragraph); *Hanly v. Kleindienst,* 471 F.2d 823, 828 (2 Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

■■■■ The term "major federal action" is not defined in NEPA, and the statute nowhere expressly addresses the question of ongoing projects. It is well settled that the requirements of section 102(2)(C) do not apply retroactively. *Life of the Land v. Brinegar,* 485 F.2d 460, 466 n. 7 (9 Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). However, the mere fact that a project was initiated prior to January 1, 1970, will not insulate all future action pursuant to that project from the requirements of NEPA. *Id.* According to guidelines prepared by the Council on Environmental Quality construing NEPA,

"Agencies have an obligation to reassess ongoing projects and programs in order to avoid or minimize adverse environmental effects. The section 102(2)(C) procedure shall be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the act on January 1, 1970. * * *." CEQ Guidelines, 40 C.F.R. § 1500.13 (1976).[13]

Courts have recognized that "further major federal action" requiring the preparation of an EIS may occur when a project takes place in incremental stages of major proportions, *Lathan v. Volpe,* 455 F.2d 1111, 1121 (9 Cir. 1971), or when a revision or expansion of the original facilities is contemplated, *Sierra Club v. Morton,* 400 F.Supp. 610, 645 (N.D.Cal.1975). Neither of these two circumstances is present here. The Bureau has neither enlarged its capaci-

---

**13.** Although the guidelines are merely advisory, the construction placed on the Act by the agency charged with the responsibility of developing national policies to "foster and promote the improvement of the environmental quality" is entitled to considerable weight. *Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412, 421 (2 Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

ty to divert water from the Trinity River nor revised its procedures or standards for releases into the Trinity River and the drawdown of reservoirs. It is simply operating the Division within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions. This state of affairs falls squarely within the holdings of *Sierra Club v. Morton, supra,* 400 F.Supp. at 645, and *Morris v. Tennessee Valley Authority,* 345 F.Supp. 321, 324 (N.D.Ala.1972), that an EIS is not required.

In addition, the practical problems attending any requirement of an EIS for the continuing operations of completed facilities are such that it would be unreasonable to attribute any such intent to Congress. At oral argument, plaintiff's counsel was unable to specify precisely what form of EIS should be required. He vacillated between two possibilities, neither of which can provide a feasible and useful means of satisfying the objectives of NEPA. The first would be a one-time EIS similar to those which are currently prepared to consider the projected operations of proposed Bureau facilities. Such a one-time EIS could, however, have no useful purpose for completed facilities. In the case of proposed projects, the EIS performs the function of publicly airing all environmental impacts so that the agency may determine whether they are so adverse that the project should not go forward or should be modified before resources are irretrievably committed. *See* CEQ Guidelines, *supra,* 40 C.F.R. § 1500.1; *Calvert Cliffs Coord. Com. v. United States A. E. Com'n,* 146 U.S.App. D.C. 33, 449 F.2d 1109, 1128 (1971). Plaintiff does not suggest that the preparation of an EIS in this case could lead to an analogous result: the complete shutdown of

the Trinity River Division or a major overhaul of its facilities. There is no support in NEPA for such a result, which would indeed amount to retroactivity. *See Sierra Club v. Morton, supra,* 400 F.Supp. at 645 n. 61. Since agencies are already required by the CEQ Guidelines to reassess continuing operations for possible adjustment in light of current conditions, 40 C.F.R. § 1500.13 (1976), the only possible function of a "one-time" EIS would be to require the Bureau to formulate and publicize in advance its contingency plans for dealing with predictable levels of drought and surplus waters. Yet such plans would be both misleading and ultimately useless because the Bureau cannot predict what alternative actions may be available or what impacts each may have at some unknown future date.[14]

If, on the other hand, an EIS were to be required to cover continuing operations over a timespan short enough to allow realistic adjustments of operations to meet changed conditions, the Bureau and most other federal agencies would be condemned to an endless round of paperwork. The EIS process requires a practical minimum of eight and one-half months to complete, *see Flint Ridge Development Co. v. Scenic Rivers Association,* 426 U.S. 776, 789 n. 10, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), and often extends over two years. Thus, for projects such as the Trinity River Division which have an annual planning cycle, an EIS would virtually always be in process. Moreover, the logic of plaintiff's position would require a periodic EIS not only for the operation of projects completed prior to 1970, but for all ongoing projects: there is no reason to suppose that an EIS prepared prior to construction of a project would satisfactorily deal with the impacts of oper-

---

14. Plaintiff argues that the usefulness of this type of EIS is demonstrated by the Bureau's current preparation of a comprehensive EIS covering all operations in the Upper and Lower Colorado River basins. That EIS was, however, initiated in response to proposed construction of several new projects in the upper basin. Although the comprehensive study involves areas where no new construction is planned, the purpose of study in such areas is to determine the cumulative effects the new construction may have there, and to develop plans of operation in response to those effects. The uncontroverted affidavit of Bureau environmental specialist William D. Harper, filed July 29, 1977, establishes that the Bureau has never prepared an EIS covering operational procedures unrelated to new construction or to long-term changes in operation subsequent to January 1, 1970.

ations under unknown future conditions.[15] If section 102(2)(C) were interpreted to require such "operational" EIS's, the resulting interference with the intended functions of federal agencies could be so great as to render compliance "impossible" within the meaning of the introductory paragraph of section 102, which directs compliance with its terms only "to the fullest extent possible." 42 U.S.C. § 4332.[16]

Plaintiff relies on three district court decisions that it claims have ordered the preparation of an EIS in similar circumstances. The first, *Sierra Club v. Mason*, 351 F.Supp. 419 (D.Conn.1972), is plainly distinguishable. The action in question was a major harbor dredging operation of a sort which had not been done since 1958. The Court merely concluded that such an operation could not be characterized as ongoing maintenance of the completed harbor, but had a separate "life of its own." 351 F.Supp. at 425. The other two cases did involve ongoing programs calling for annual activity, but are nevertheless distinguishable. In *Lee v. Resor*, 348 F.Supp. 389 (M.D.Fla. 1972), the Court ordered the Army Corps of Engineers to prepare an EIS for a twenty-year old program for the use of herbicides to control water hyacinths in the Saint Johns River in Florida, but declined to enjoin the program pending the preparation of the EIS. Similarly, in *Wisconsin v. Callaway*, 371 F.Supp. 807 (W.D.Wis.1974), the Corps' annual dredging of the Mississippi River was held major federal action and enjoined pending the preparation of an EIS. Regardless of the correctness of these results, they may be distinguished from the present case in that the Corps' regulations expressly stated a policy requiring the preparation of an EIS for all continuing projects. *Lee v. Resor, supra,* 348 F.Supp. at 394. In contrast, there is no suggestion in the Bureau's regulations that an EIS need be prepared for continuing actions unless they are "major actions" within the meaning of section 102(2)(C).[17]

15. The Trinity River Division itself provides the example. Adverse environmental impacts were a major concern at the time of congressional authorization of the project, and the effects of the projected operations were extensively studied by both the USFWS and the CDFG. *See* H.R.Doc.No.55, 147, 84th Cong., 1st Sess. (1955). Both the USFWS and the House and Senate Committees reporting the bill concluded that *no significant adverse impacts* were to be anticipated. *Id.*; H.R.Rep.No. 602, *supra*, at 4; Sen.Rep.No.1154, *supra*, at 4. The CDFG, while warning that the projected minimum releases later incorporated in the 1959 agreement were dangerously low, nevertheless agreed in substance with the USFWS. H.R.Doc.No.147, *supra*, at 38, 41.

16. The legislative history of NEPA is clear that that clause was intended to apply only where existing law prohibits compliance with NEPA or otherwise makes it impossible. Conference Report No. 765, 91st Cong., 1st Sess. (1970), 1969 U.S.Code Cong. & Admin.News, p. 2770. However, the obligations of the agencies under their authorizing statutes to perform certain operational functions would seem to render it impossible for them to comply with administrative requirements of the magnitude contemplated here.

17. In defining the actions to which the chapter on EIS's is applicable, the regulations state:

"The provisions of this chapter apply to continuing *major Bureau actions* having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the act.

"Where it is not practicable to reassess the basic course of action, continuing *major actions* must be shaped to minimize adverse environmental consequences. It is also important in continuing actions that account be taken of environmental consequences not fully evaluated at the outset of the project or program. Ongoing programs or uncompleted features of projects which were authorized prior to January 1, 1970, must be reconsidered to determine whether they constitute *major Federal actions* significantly affecting the environment. If the ongoing program or uncompleted feature of a project has significant environmental impact, alternatives must be considered and an environmental statement must be prepared." Reclamation Instructions Part 376, Ch. 5.2.B, 37 Fed.Reg. 1126 (1972) (emphasis added).

Although the last quoted sentence is somewhat ambiguous, the obvious intent was simply to clarify the meaning of "major federal action," not to increase the range of activities requiring an EIS. *This section on applicability limits the subsequent section of the regulations which lists Bureau actions which "may require environmental impact statements."* Part 376, Ch. 5.6. Thus, whether or not the activities in question constitute "changes in river operation or reservoir operation procedures," Ch. 5.6(I)(1), and whether or not the permissive language of Section 5.6 imposes any duty on the Bureau, no EIS is required by the regulations absent "major federal action."

More significantly, the cases cited by plaintiff are distinguishable from the instant case as well as *Sierra Club v. Morton, supra*, and *Morris v. Tennessee Valley Authority, supra*, in that neither involved the operations of completed *facilities*. Both dealt with projects which were authorized prior to 1970 and may perhaps have required the acquisition of some equipment, but neither called for the construction of major facilities at enormous sunk cost. Thus, it is more reasonable to suppose that Congress intended them to be completely reevaluated by means of a "one-time" EIS, rather than merely "reassessed" by the responsible agency as required by the CEQ Guidelines. 40 C.F.R. § 1500.13 (1976).

Finally, the policy underlying these decisions does not require the preparation of an EIS in the face of serious practical difficulties. The reasoning of the Court in *Lee v. Resor, supra*, was that "[i]t would be ironic if Congress did not intend to affect those projects and agency decisions that provided the impetus for the Act. Congress doubtless intended that NEPA have some application to the type of situation presented here." 348 F.Supp. at 395. However, to refuse to order the preparation of an EIS is not to license unlimited environmental degradation by allowing continuing operations to escape the reach of NEPA altogether. Pursuant to the CEQ Guidelines, each agency has an obligation to reassess all operations "in order to avoid or minimize adverse effects on the environment." 40 C.F.R § 1500.13 (1976). This requirement is sufficient to satisfy the policy of NEPA without imposing a monumental and unintended burden on the operation of federal facilities.

For the foregoing reasons, plaintiff's prayer for an injunction or an order must be denied. However, the Court notes that the Bureau does have an obligation under NEPA to reassess its operation of the Trinity River Division in light of its environmental impacts. Should it fail to do so, an action challenging that failure would under the related case doctrine be quickly heard by this Court. Local Rule of Practice No. 101.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

IT IS HEREBY ORDERED that judgment shall be entered in favor of defendants on each of the claims raised in the amended complaint.

IT IS HEREBY FURTHER ORDERED that counsel for defendants shall prepare an appropriate form of judgment and submit it to the undersigned for execution within ten (10) days of the date of this order.