[No. D009784. Fourth Dist., Div. One. May 7, 1990.]

RICHARD LEACH et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

COUNSEL

Georgine Brave for Plaintiffs and Appellants.

John W. Witt, City Attorney, Ronald L. Johnson, Assistant City Attorney, C. Alan Sumption and Leslie J. Girard, Deputy City Attorneys, for Defendants and Respondents.

OPINION

**DOMNITZ, J.**\*—Petitioners Petitioners Richard Leach and the Campo/Lake Morena Chamber of Commerce (together Leach) appeal an order denying their petition for writ of mandate to stop the City of San Diego and its manager John Lockwood (together City) from drafting water from Lake Morena without first complying with the California Environmental Quality Act (CEQA). We conclude CEQA does not apply to the activity of drafting water from one reservoir to another and accordingly affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

Lake Morena is a reservoir built in 1912 and acquired by the City in 1914 for the purpose of water supply. Although recreational uses have been permitted as conditions allow, such uses have been secondary to the primary purpose of local water production. Morena is part of a three-reservoir system, Otay, Barrett and Morena, which feeds the Otay Filtration Plant adjacent to Lower Otay Reservoir. Morena feeds Barrett which feeds Otay. Lower Otay Reservoir provides the water to be treated at the Otay Filtration Plant for human consumption.

---

\* Assigned by the Chairperson of the Judicial Council.

Barrett and Morena are operated solely for the production of local water. The water is collected in the winter of wet years and consumed as quickly as possible to leave sufficient volume in the reservoir to capture water during the next wet season. The reservoirs are operated to maximize the use of local water and to minimize losses. Unlike Barrett and Morena, Otay is used for emergency water storage and to supply the filtration plant. All three reservoirs receive water only from runoff from natural rainfall.

The Otay Filtration Plant operates continuously to meet water demands in its service area. In order to operate efficiently, Otay must be near full. As water is removed from Lower Otay Reservoir, its level drops and additional water is usually added from Barrett whose water would be replenished by Morena. This process is called "drafting." Thus, to be consumed, water in Morena must first be drafted to Barrett and then to Lower Otay. Withdrawals occur until each reservoir reaches a predetermined minimum pool. After that, no further drafts can occur from that reservoir.

Because the water in the reservoirs is replenished only by natural rainfall, the levels of the reservoirs cannot be predicted. As water is consumed, one of the three reservoirs must supply water and its level will drop accordingly. Factors affecting increases and losses in each reservoir include runoff from precipitation, evaporation, leakage through the dam, and the size and shape of the reservoir. Runoff is highly variable and unpredictable. Evaporation, however, is constant and poses serious problems in this particular reservoir system. The largest evaporation losses occur at Morena because it is the most shallow and has the largest surface area. Studies have indicated Barrett is more efficient for storage purposes than Morena.

From 1980 to 1984, no drafting was necessary because Morena and Barrett were full. From 1984 to 1988, the City drafted almost exclusively from Barrett to service Lower Otay. This decision was based on the belief that water would be conserved because spillage from Morena flows into Barrett whereas spillage from Barrett is lost to the ocean. As a result, Morena had too much and Barrett had too little water. During that period, Morena remained virtually untouched. Consequently, an ecosystem built up, becoming a habitat for fish, birds and other wildlife.

Between January 1, 1984, and January 31, 1989, the storage in Morena decreased by about 50 percent, due almost entirely to evaporation and leakage. The loss occurred despite the fact Morena received an additional 11,081 million gallons in runoff during the period January 1, 1984, to January 1, 1988. In that time, the level decreased from 157.4 feet to 137.6 feet. The surface area decreased about 40 percent, from 1,553 acres to 982 acres. Only a total of 994 million gallons of the loss was attributable to

drafting. Approximately 9,918 million gallons of water were lost forever due to evaporation.

The monetary loss was substantial, about $8 million at the current county water authority filtered water rate. In terms of water ethics, the loss represented the same amount of water consumed by 30,000 families annually or the annual conservation of 300,000 families exercising 10 percent conservation.

In November 1988, the City began drafting water from Morena to Barrett because Otay needed water, Barrett was at minimum pool, and Morena has a high evaporation rate. No environmental impact report (EIR) was prepared for that action.

On December 8, 1988, Leach filed a petition for writ of mandate in the superior court to stop the reduction of Morena's volume because the City failed to comply with CEQA. He argued he and other residents in the area would be affected by the damage to the environment caused by the City's drafting of water from Morena. The court issued a temporary restraining order stopping the City from drafting water from Morena pending the hearing on the petition for writ of mandate. After hearing, the court denied the petition for writ of mandate on the ground the City's action did not constitute a "project" under CEQA. After filing a notice of appeal, Leach filed a petition for writ of supersedeas and request for stay in this court. We denied the petition on the ground it appeared to have no merit. Three months later, Leach filed another petition for writ of supersedeas which we also denied.

On appeal, Leach contends (1) the statutory term "project" should be interpreted broadly to encompass the draining of water from Lake Morena; (2) the City may not declare the draining of water from Lake Morena to be a solely ministerial act; (3) even as a project of mixed ministerial/discretionary nature, the draining of water is still within the scope of CEQA; and (4) CEQA applies because the water was not drained from Lake Morena for 10 years and an environment was allowed to build up.

DISCUSSION

The Legislature enacted CEQA (Pub. Resources Code, § 21000 et seq.)[1] "to protect the environment by the establishment of administrative procedures drafted to 'Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.' (Pub. Resources Code,

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

§ 21001, subd. (d).)" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) In order to assess and evaluate the environmental effect of every public agency action, EIR's must be prepared for all "projects" having "a significant effect on the environment." (§ 21151; *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at pp. 74-75.)

Under section 21065, project is defined as "activities directly undertaken by any public agency." ■ Thus, the drafting of water between reservoirs by the City would qualify as a project under this definition. However, CEQA and its guidelines apply only to discretionary, not ministerial, projects that have an ultimate impact on the environment. (§ 21080, subd. (b)(1); *City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 538 [230 Cal.Rptr. 867].)

" 'Ministerial' describes a governmental decision involving little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or judgment in reaching a decision. A ministerial decision involves only the use of fixed standards or objective measurements, and the public official cannot use personal, subjective judgment in deciding whether or how the project should be carried out." (Cal. Code Regs., tit. 14, § 15369.)

Here, the City's operation of its reservoir system is a ministerial activity. These reservoirs were constructed for the sole purpose of ensuring a portion of San Diego's population a constant water supply. They were intended to be drafted for such use. The decision to draft water from one particular reservoir to another within this system does not involve personal judgment as to the wisdom or manner of carrying it out. Rather, the system is designed to transfer water in response to various fluctuating factors including consumer demand and weather conditions, for the ultimate purpose of supplying water to the City's residents. The only decision to be made is the timing of the drafting, not the method. Even the timing decision is one which calls for a given response to a given fact situation in a manner consistent with the law. (See, e.g., Wat. Code, §§ 10610-10656 (Urban Water Management Planning Act); San Diego Mun. Code, § 67.00 et seq.)[2]

---

[2] As declared by the Legislature in Water Code section 10610.2: "(a) The waters of the state are a limited and renewable resource subject to ever increasing demands. [¶] (b) The conservation and efficient use of urban water supplies are of statewide concern; however, the planning for that use and the implementation of those plans can best be accomplished at the local level." The Legislature further declared in Water Code section 10610.4: "(a) The conservation and efficient use of water shall be actively pursued to protect both the people of the state and their water resources. [¶] (b) The conservation and efficient use of urban water supplies shall be a guiding criterion in public decisions. [¶] (c) Urban water suppliers shall be required to develop water management plans to achieve conservation and efficient use."

Barrett and Morena operate solely to produce local water. Both feed into Otay which services the Otay Filtration Plant to provide potable water. Otay must be kept full as it operates continuously to meet the water demands in its service area. As water is removed from Lower Otay, it must be replenished from Barrett whose water must in turn be replenished from Morena because of their respective positions in the water supply system. When Barrett reaches minimum pool, replenishment must be forthcoming from the only available source, Morena. The decision to draft is ministerial because there is no other choice than to use the water system for the purpose for which it was designed.

While conceding the operation of the reservoir system involves many ministerial tasks, Leach contends the decision to drain Morena after a 10-year period of nonactivity was discretionary. Citing *People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185 [119 Cal.Rptr. 266], Leach asserts because the project is a mixed ministerial-discretionary one, it is within the scope of CEQA.

In *Department of Housing,* the state argued a permit for the construction of a mobilehome park was invalid because it issued without an EIR. The Court of Appeal agreed, holding the project was of a mixed ministerial-discretionary character and, as such, required an EIR. (45 Cal.App.3d, at pp. 193-194.) The court reasoned that although the construction permit is governed by fixed design and construction specifications in statute or regulation, conformity with more generalized standards, such as whether the site is well-drained and graded, is a relatively personal decision "addressed to the sound judgment and enlightened choice of the administrator." (*Id.* at p. 193.)

Here, in contrast, the decision to draft water from Morena in 1988, after not having done so for 10 years, was not based on anyone's personal opinion, but on the conditions existing at the time making drafting from Morena necessary to operate the reservoir system to provide potable water to the community. Thus, Leach's reliance on *Department of Housing* is misplaced.

"To properly draw the line between between 'discretionary' and 'ministerial' decisions in this context, we must ask why it makes sense to exempt the ministerial ones from the EIR requirement. The answer is that for truly ministerial permits an EIR is irrelevant. No matter what the EIR might reveal about the terrible environmental consequences of going ahead with a given project the government agency would lack the power (that is, the discretion) to stop or modify it in any relevant way. The agency could not lawfully deny the permit nor condition it in any way which would mitigate the environmental damage in any significant way. . . . Thus, to require the

preparation of an EIR would constitute a useless—and indeed wasteful—gesture." (*Friends of Westwood, Inc.* v. *City of Los Angeles* (1987) 191 Cal.App.3d 259, 272 [235 Cal.Rptr. 788].)

Under the circumstances here, CEQA cannot reasonably be construed to require an EIR. According to council policy 400-3, "[t]he City Council recognizes that the primary purpose of the water impounding system is to supply potable water to municipal consumers. The reservoir recreation program shall operate as a secondary function without detriment to, and with an understanding of, the primary operational responsibilities of the system." The only way to accomplish the primary purpose of water supply is to draft water between the reservoirs as needed. We are not unmindful that the drafting of Morena is likely to have a significant environmental impact on a reservoir that remained untouched for 10 years and built up an ecosystem. However, we note the affected ecosystem here is not indigenous to the area but rather developed in response to the artificial lake created for a utilitarian purpose. In spite of the environmental consequences, the City could do little or nothing to prevent or modify drafting of water between reservoirs to "mitigate the environmental damage in any significant way." (*Friends of Westwood, Inc.* v. *City of Los Angeles, supra*, 191 Cal.App.3d, at p. 272.) To require an EIR every time drafting of a reservoir is proposed for the ultimate purpose of supplying the community with water would indeed be useless and wasteful.

Drafting must occur in the reservoir system in order to efficiently operate the filtration plant to supply water. Because the operation of this system is a ministerial activity within the meaning of CEQA, no EIR was required.[3]

### DISPOSITION

The order is affirmed.

Work, Acting P. J., and Todd, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 25, 1990.

---

[3]City further argues an EIR is not required because the activity of drafting falls under a categorical exemption of CEQA as a public utility service. (See §§ 21080, subd. (b)(10), 21083, 21084; Cal. Code Regs., tit. 14, §§ 15300-15329.) However, we need not address this issue in light of our conclusion the drafting of Morena is exempt from the requirements of CEQA because it is a ministerial activity.