[No. B065023. Second Dist., Div. Six. Apr. 1, 1993.]

NACIMIENTO REGIONAL WATER MANAGEMENT ADVISORY
COMMITTEE, Plaintiff and Appellant, v.
MONTEREY COUNTY WATER RESOURCES AGENCY, Defendant and
Respondent.

**COUNSEL**

Sinsheimer, Schiebelhut & Baggett, Robert K. Schiebelhut and Thomas D. Green for Plaintiff and Appellant.

Douglas C. Holland, County Counsel, and William K. Rentz, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**GILBERT, J.**—A government agency builds a dam many years prior to the enactment of the California Environmental Quality Act (CEQA). The application to build the dam provides for the storing and annual release of water for various uses. Here we hold that the agency's annual decision to release varying amounts of water to competing interests is part of an ongoing project, and is therefore exempt from CEQA.

The Nacimiento Regional Water Management Advisory Committee (Committee) appeals from the judgment of the trial court denying its petition for writ of mandate. Committee seeks to compel respondent, Monterey

County Water Resources Agency (Agency), to set aside its 1991 annual water release schedule for the reservoir at Lake Nacimiento pending compliance with CEQA. (Pub. Resources Code, § 21000 et seq., eff. Nov. 23, 1970.)

The annual release schedule is part of the ongoing operation of the reservoir and, therefore, is exempt from CEQA. We affirm.

## FACTS

In 1955, the State of California approved Agency's application to build Nacimiento Dam to store and release water annually for "irrigation and related Domestic, Municipal, Industrial, and Recreational uses with incidental flood control . . . ." The application described the purposes, resources and operation of the dam.

"The stored water so released and absorbed will mingle with the naturally available percolating ground water of the Salinas Valley and the mingled supply will be used by the landowners in Zone 2 of the District for the various uses for which they have beneficial needs."[1]

"The naturally available percolating waters . . . are now used to meet the needs of the overlying owners for irrigation, for domestic use incidental to irrigation, for municipal use, and for industrial use. These mingled uses will continue and will draw on the naturally available and the artificially replenished . . . waters without recognition of separate rights of the different uses either in the amount of use or the priority of right in the waters to be appropriated under this application. This application is made for the joint and common benefit of all such uses. The portions of the total future use which may be secured from the water . . . are not determinable and will vary from year to year."

In its application, Agency projected the most probable future uses. Agency projected relatively small amounts would be made available for municipal and industrial uses and that "[t]he remainder of the water to be secured under this application will be used for irrigation." "A minimum storage pool with a capacity of 10,000 acre feet for recreation purposes will be maintained in the Nacimiento Reservoir."

Agency also stated that the "*supply will vary from nothing* in the occasional years in which no storable run-off will be available *to the full*

---

[1]Agency established zone 2 as the zone of benefit for the dam and reservoir project. All of zone 2 overlies the Salinas Valley groundwater basin.

*reservoir capacity* in the other occasional years . . . ." (Italics added.) In particular, "*[t]he water released* from the Nacimiento Reservoir for replenishment of the naturally available ground water storage . . . *will vary . . . from year to year.*" (Italics added.)

Pursuant to the permit issued by the state in accord with this application, the voters of zone 2 approved the project, bonds were issued and the proceeds were used to build the dam. The dam was completed in February 1957, and Agency started to use it immediately. The permit required annual progress reports which, inter alia, required "[e]stimate of augmentation to underground supply during water year caused by operation of Nacimiento Reservoir . . . ."

On November 4, 1965, the state issued a license for the diversion and use of water from the reservoir. This license established that Agency had perfected the uses discussed above, subject to an additional agreement of October 19, 1959, between Agency and the San Luis Obispo County Flood Control District. That agreement, inter alia, changed the minimum pool level from 10,000 to 22,000 acre-feet and required that Agency, "to the extent required by public health or other law, terminate, abolish, regulate or restrict recreational activities in, around or upon the waters of Nacimiento Reservoir . . . to enable San Luis Obispo District to make use of said water . . . ."

Agency conducted no "environmental review" for the construction or operation of the reservoir, or for annual release schedules either before or after November 23, 1970, the effective date of CEQA.

Agency's 1991 annual release schedule, at issue in this case, specified an initial water elevation of 745 feet and a final elevation of 689 feet—a drop of 56 feet. For 7 of its 33 years of operation, the reservoir's water elevation fell to 689 feet or less 8 times: in 1960, 1961, 1969, 1972, 1977, 1988, 1989, excluding 1990 (level at 689 feet). The trial court noted that in 1985 the surface level fell to 695 feet. In 9 of those 33 years, Agency permitted a drop of 55 feet or more. In four of those years, the minimum pool level was only six hundred seventy feet.

In devising the schedule, Agency considered: 1. providing maximum groundwater recharge for the entire Salinas Valley, 2. keeping the lakes at levels sufficient to provide good recreation benefits, 3. providing for the needs of fish and wildlife, 4. generating electricity at the Nacimiento Hydropower Plant, and 5. wasting as little water as possible to evaporation or to the ocean.

Although the trial court found that implementation of this release schedule "would negatively impact environmental concerns in the reservoir, including

lake fisheries and wildlife, as well as visual, aesthetic, and recreational concerns in the reservoir," it held that the annual 1991 release schedule was exempt from environmental review under CEQA because it is part of an ongoing project, the operation of the reservoir.

DISCUSSION

■ Committee contends that Agency's 1991 annual schedule constitutes a project or that it represents a modification of Agency's previous practice which triggers environmental review under CEQA.

" '[I]n CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to [e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions. (Pub. Resources Code, § 21001, subd. (d).) To achieve these objectives, CEQA and the guidelines issued by the State Resources Agency to implement CEQA establish a three-tiered structure [to determine whether any environmental review under CEQA is required]. If a project falls within a category exempt by administrative regulation . . . no further agency evaluation is required. . . .' " (*Burbank-Glendale-Pasadena Airport Authority* v. *Hensler* (1991) 233 Cal.App.3d 577, 591 [284 Cal.Rptr. 498].)

Public Resources Code section 21065 defines the term "project" to mean "(a) Activities directly undertaken by any public agency. . . ." Guidelines issued by the State Resources Agency pursuant to CEQA define the term project more specifically to mean "the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately, and that is any of the following: [¶] (1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities clearing or grading of land . . . ." (Cal. Code Regs., tit. 14 (hereafter Guidelines), § 15378.)

Guidelines, section 15378, subdivision (b), states, inter alia, that "[p]roject does not include: [¶] (1) Anything specifically exempted by state law . . . ." Guidelines, section 15261 exempts ongoing projects as follows: "(a) If a project being carried out by a public agency was approved prior to November 23, 1970, the project shall be exempt from CEQA unless either of the following conditions exists: [¶] (1) A substantial portion of public funds allocated for the project have not been spent, and it is still feasible to modify the project to mitigate potentially adverse environmental effects, or to choose feasible alternatives to the project, including the alternative of 'no project' or halting the project . . . . [¶] (2) A public agency proposes to modify the project in such a way that the project might have a new significant effect on the environment."

The construction of the dam and its operation as a reservoir is an ongoing project under Guidelines, section 15261. Because the 1991 release schedule is a normal, intrinsic part of the ongoing operation of the reservoir project which does not constitute any modification thereof, it is exempt from environmental review under CEQA.

Whether an activity requires environmental review depends upon whether it expands or enlarges project facilities or whether it merely monitors and adjusts the operation of existing facilities to meet fluctuating conditions. (Cf. *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 806-807 [108 Cal.Rptr. 377]—construction of additional pumping facilities and wells for new groundwater extraction program increasing intensity and scope of original aqueduct program deemed modification requiring environmental review; and *Sierra Club* v. *Morton* (N.D.Cal. 1975) 400 F.Supp. 610, 650—environmental impact report (EIR) required for proposed additional pumping facilities, but no EIR required either for peripheral canal plant completed and operational before advent of CEQA or for increased pumping using existing facilities; *Upper Snake River* v. *Hodel* (9th Cir. 1990) 921 F.2d 232, 234-235—periodically adjusting flow of water from dam and reservoir does not require environmental review because it does not constitute expansion or revision of reservoir project; *County of Trinity* v. *Andrus* (E.D.Cal. 1977) 438 F.Supp. 1368, 1388-1389—lowering level of reservoir during drought year does not require preparation of environmental impact statement (EIS) because this activity is integral to continuing operation of completed dam and reservoir project; see also *Leach* v. *City of San Diego* (1990) 220 Cal.App.3d 389, 393-395 [269 Cal.Rptr. 328]—decision to draft from one reservoir to another for first time in 10 years is project involving ministerial decision necessitated by law and conditions and therefore is exempt from CEQA.)

The circumstances presented in *Upper Snake River* v. *Hodel, supra,* 921 F.2d 232, are closely akin to those presented here. The question before the Ninth Circuit was whether the federal Bureau of Reclamation (Bureau) needed to prepare an EIS pursuant to the National Environmental Policy Act (42 U.S.C. § 4321 et seq. (hereafter NEPA)) before periodically adjusting the flow of water from the Palisades Dam and Reservoir. (*Hodel, supra,* at p. 233.)

The Palisades Dam and Reservoir had been in operation since 1956. It was one of a series of dams and reservoirs along the Snake River whose purpose was to "control and conserve the waters in the River for fish and wildlife, recreation, irrigation, flood control, and power generation." (921 F.2d at p. 233.)

The amount of water in the river "fluctuates considerably from year to year" and is controlled and regulated on the basis of annual cycles. (921 F.2d at p. 233.)

The standard operating procedure since 1956 was to maintain the flow of water in the river above 1,000 cubic feet per second (cfs). The rate of release during dry periods averaged less than 1,000 cfs only 4.75 percent of the total days the dam had been in operation, although the rate of release declined to below 1,000 cfs during 10 of the 30 years of the reservoir's operation. (*Upper Snake River* v. *Hodel, supra,* 921 F.2d at pp. 233-234.) Reduction of stream flow below 1,000 cfs has a deleterious effect on fisheries.

Due to dry conditions, the Bureau reduced flow to 750 cfs in 2 consecutive years to increase stored water for irrigation purposes. The trial court ruled that the extent of injury to the fish population was immaterial to the determination of whether an EIS was required because "[i]n the case of the Palisades Dam, the fluctuating flows are routine actions which are contingent upon Mother Nature for snow-pack, runoff, precipitation, and carry-over. As part of its routine and ongoing operations, the [Bureau] fluctuates the flows depending upon weather conditions past and future. Overall, the Court views the fluctuation of flows below Palisades as 'ongoing operations' which do not have to comply with the EIS provisions of NEPA." (*Upper Snake River* v. *Hodel, supra,* 921 F.2d at p. 234.) The Circuit Court of Appeals agreed. (*Ibid.*)

Cases subject to NEPA are also applicable to CEQA. (*Sierra Club* v. *Morton, supra,* 400 F.Supp. at p. 650; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260-261 [104 Cal.Rptr. 761, 502 P.2d 1049].) NEPA, like CEQA, became effective in 1970 and does not apply retroactively. Because Palisades Dam and Reservoir had been completed in 1956 and was operating continuously since then, "an EIS cannot be required on the basis of the project's construction. However, if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS. [Citation.] (' "[M]ajor Federal actions" include the "expansion or revision of ongoing programs." ')." (*Upper Snake River* v. *Hodel, supra,* 921 F.2d at pp. 234-235; and see Guidelines, § 15261; *County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d 795; and *Sierra Club* v. *Morton, supra,* 400 F.Supp. 610, under CEQA environmental review required for ongoing projects only if modifications, such as expansion or additional facilities, are proposed.) An EIS is unnecessary to discuss the " '. . . mere continued operation of a facility.' " (*Hodel, supra,* at p. 235.)

Like the *Hodel* court, we find the reasoning of the federal district court in *County of Trinity* v. *Andrus, supra,* 438 F.Supp. 1368, "particularly instructive." (*Upper Snake River* v. *Hodel, supra,* 921 F.2d at p. 235.) In *Andrus,*

plaintiff sought to enjoin the Bureau from lowering the level of a reservoir during a drought year because of potential harm to the fish population in the reservoir. The enabling legislation to build the dam and reservoir stated its principal purpose to be " 'increasing the supply of water available for irrigation and other beneficial uses in the Central Valley of California.' " (*Andrus, supra,* at p. 1380.) The Bureau's operating policy for the year in question included a rationing plan. (*Id.,* at p. 1373.)

During the 10-year period defendants in *Andrus* had operated the dam, they periodically adjusted up or down the volume of water released depending on the river's flow. The *Andrus* court held that "actions taken in operating the system of dams and reservoirs (in particular, operational responses in a drought year) were not 'major Federal actions' within the meaning of NEPA." (*Upper Snake River* v. *Hodel, supra,* 921 F.2d at p. 235.)

As in the instant case, "[t]he Bureau has neither enlarged its capacity to divert water . . . nor revised its procedures or standards for releases . . . and the drawdown of reservoirs. It is simply operating the Division within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions." (*Upper Snake River* v. *Hodel, supra,* 921 F.2d at p. 235, quoting *County of Trinity* v. *Andrus, supra,* 438 F.Supp. at pp. 1388-1389.) The *Hodel* court commented, "[w]hat they [the Bureau in the *Andrus* situation] did in prior years and what they were doing during the period under consideration were no more than the routine managerial actions regularly carried on from the outset without change. They are simply operating the facility in the manner intended." (*Hodel, supra,* at p. 235.) And so it is here.

Committee opines that under *Leach* v. *City of San Diego, supra,* 220 Cal.App.3d 389, the instant 1991 release schedule is a discretionary project subject to environmental review under CEQA. In *Leach,* the city drafted water from a particular reservoir to another for the first time in 10 years to provide adequate drinking water to the city. Plaintiff maintained that although the operation of the reservoir system involves ministerial tasks, the decision to drain the reservoir for the first time in 10 years constitutes a discretionary act. (*Id.,* at p. 394.)

The appellate court held that drafting of the reservoir constitutes a project, but that the decision to draft is a ministerial activity mandated by extant conditions. (*Leach* v. *City of San Diego, supra,* 220 Cal.App.3d at pp. 393-395.) The Court of Appeal held that ". . . CEQA does not apply to the activity of drafting water from one reservoir to another . . . ." (*Id.,* at p. 390.)

Committee urges that because the instant case involves balancing competing multiple uses, the release schedule is a discretionary project subject to CEQA. We disagree and find that *Leach* is distinguishable in a more fundamental sense. Unlike the instant case, it does not appear that annual release schedules were part of the project to build the reservoir in *Leach* in 1912. The appellate court in *Leach* only discussed drafting among the reservoirs from 1980 onwards. The *Leach* court apparently did not consider whether annual drafting decisions were contemplated in the project to build the reservoir system before CEQA was enacted. Therefore, the *Leach* court had no opportunity to consider whether such drafting schedules are part of the ongoing project of the reservoir system.

*Hodel* and *Andrus* are more akin to the instant case. They both involved reservoir projects which from their pre-NEPA inception incorporated annual release determinations concerning multiple uses, with irrigation being the primary use contemplated. Those appellate courts held that such determinations are exempt activities of an ongoing project.

### Objections to Statement of Decision

Committee contests the ruling denying four objections to the statement of decision. None has merit. First, Committee objects to the finding that ". . . Agency would abolish or restrict recreation on the Nacimiento Reservoir, if necessary to enable San Luis . . . District to make use of an entitlement of water granted to that district by the Agency and confirmed by the license" on the grounds that it is unnecessary to the judgment and that it is not supported by the evidence.

The state license obtained by Agency in 1965 to continue operation of the reservoir, *ante*, is subject to an agreement between the districts which permits Agency to restrict recreational use. Because reference to this evidence is surplusage to the decision, it is of no moment.

Committee's second objection is that there is no evidence to support the trial court's finding that the reason the reservoir reached minimum pool on cited occasions is because of groundwater recharge releases. Not so. Chief engineer for Agency, Joe Madruga, declared that to fulfill the original purpose approved for the reservoir, "it is necessary to drain the lake so that the water will then recharge the groundwater basin . . . ." He stated that "it is absolutely essential that sufficient water be available to recharge the groundwater basin each and every year." The application, permit and license to operate the reservoir provide for releases to minimum pool so as to recharge the groundwater basin of the Salinas Valley.

The only evidence proffered by Committee to rebut this substantial evidence is that of Committee's chairperson, Hal Hunsberger, a "concerned citizen" who attended some advisory commission meetings and who is "not a water expert and cannot meet the Agency's technical arguments." ▉ Where there is conflicting extrinsic evidence, " '. . . any reasonable construction by the lower court will be upheld . . . .' " (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1084 [258 Cal.Rptr. 721].)

Third, Committee objects that the only evidence to show that the lake has been operated properly is that of Madruga's. The evidence he provided is sufficient. (*In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 162 [228 Cal.Rptr. 76].) Moreover, the issue in this case is not whether the reservoir historically has been operated properly, but whether the 1991 release schedule is exempt from review under CEQA.

Last, Committee objects to the trial court's finding that "it must be assumed that the Agency complied with the law and did perform the environmental review [as to a power plant constructed in 1985]." Because the release schedule is the matter at issue, and it is exempt from CEQA, it is immaterial whether or not environmental review had been conducted regarding a power plant.

The judgment is affirmed. Costs to Agency.

Stone (S. J.), P. J., and Yegan, J., concurred.