Filed 4/29/14  South Yuba Water Dist. v. State Water Resources Control Bd. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (San Joaquin)

----

| | |
|---|---|
| SOUTH YUBA WATER DISTRICT, | C072870 |
| Plaintiff and Appellant, | (Super. Ct. No. CV026505) |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD et al., | |
| Defendants and Respondents. | |

In 2003, the State Water Resources Control Board (State Water Board) adopted Revised Water Right Decision 1644 (RD-1644), which amended the Yuba County Water Agency's (Water Agency) water right permits involving the reservoir system the Water Agency operates on the upper Yuba River.  RD-1644 required higher instream flows and cooler water temperatures to support anadromous fish on the lower Yuba River (upstream of Marysville and the Yuba River's confluence with the Feather River).

1

Plaintiff South Yuba Water District (the District) unsuccessfully challenged in the trial court the State Water Board's adoption of RD-1644. The District now appeals, claiming the State Water Board, in adopting RD-1644, violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), the public trust doctrine, and certain constitutional provisions (taking property without compensation, impairing contract, and procedural due process).

The trial court found that most of the District's claims were moot, in light of a subsequent State Water Board order which "completely superseded" the instream flow requirements and "supplemented" the water temperature requirements of RD-1644, and which the District did not challenge. The court further found that the District lacked standing to bring its due process claim. We agree with the trial court. To the extent the District's claims on appeal are moot, or the District lacks standing to bring them, we shall dismiss the appeal; in all other respects, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Water Agency owns and operates the Yuba River Development Project (the Development Project). The primary features of the Development Project are the New Bullards Bar Dam/Reservoir—which is located on the North Yuba River and can hold nearly 1 million acre-feet of water—and two power plants. The Development Project, which was completed in 1970 before the enactment of CEQA later that year, is used for flood control, irrigation, recreation, fishery protection and enhancement, and power production. Downstream of the Development Project are two federally owned and operated dams, the Englebright Reservoir and the Daguerre Point Dam.

In 1988, several environmental groups filed a complaint with the State Water Board, requesting that the board increase the Yuba River instream flow requirements in the Water Agency's water rights permits, to better protect fish.

2

Following evidentiary hearings in 1992 and 2000, the State Water Board adopted the original Water Right Decision (D-1644) in 2001, which required, among other things, that the Water Agency increase instream flows.

The Water Agency, the District, and others filed suit challenging D-1644, and the Yuba County Superior Court remanded the matter to the State Water Board to consider new additional evidence.

Pursuant to the remanded proceedings, the State Water Board adopted RD-1644 in 2003. RD-1644 specified requirements regarding instream flows, and requirements related thereto—one could say, flowing therefrom—concerning water temperatures and flow fluctuations ("ramping"). In adopting RD-1644, the State Water Board issued a notice of exemption from CEQA.

The Water Agency and several other parties filed five separate lawsuits in Yuba County Superior Court, challenging RD-1644. Pursuant to stipulation, these lawsuits were consolidated and transferred to the San Joaquin County Superior Court in 2005. In 2006, the trial court granted the Water Agency's motion for a stay to pursue settlement. This settlement pursuit sought "to develop a comprehensive proposal that would meet the litigants' competing interests regarding use of water from the Yuba River."

The Water Agency, most of the Water Agency's water districts (including the District), relevant state and federal authorities, and four of the five environmental parties in the RD-1644 litigation subsequently "approved principles of agreements for a proposed settlement regarding instream flow requirements and other issues related to diversion and use of water from the lower Yuba River"; this settlement is known as the Yuba Accord. The Yuba Accord is comprised of three separate types of agreements: a fisheries agreement, a water purchase agreement, and various surface and groundwater conjunctive use agreements between the Water Agency and its member districts (the District here signed a conjunctive use agreement). The Yuba Accord "modif[ied] the

instream flow requirements established by RD-1644, and . . . provid[ed] a level of protection for the lower Yuba River fisheries resources that is equivalent to or better than that in RD-1644."

The Water Agency and the relevant federal authority (U.S. Bureau of Reclamation) prepared a joint environmental impact report (EIR)/environmental impact statement (EIS) on the Yuba Accord in 2007 pursuant to CEQA and the federal National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.). This EIR/EIS went unchallenged.

In May 2008, the State Water Board adopted Corrected Water Rights Order WR 2008-0014 (WR 2008-14), which modified the Water Agency's water right permits in accord with the Yuba Accord. WR 2008-14 replaced the RD-1644 instream flow requirements with the Yuba Accord's instream flow requirements, amended some of the RD-1644 terms regarding water temperatures, and reaffirmed the RD-1644 flow fluctuation requirements.

Although it participated in the Yuba Accord negotiations and signed one of the agreements of that accord (a conjunctive use agreement), the District (along with the Cordua Irrigation District), continued to challenge RD-1644 by filing in September 2010 a first amended petition for writ of mandate based on CEQA, and a first amended petition for writ of mandate and complaint for declaratory and injunctive relief.[1]

---

[1] RD-1644 also specified requirements regarding protective fish screens. The fish screen requirements are not at issue in this appeal. In its judgment, the trial court denied relief to the District and Cordua Irrigation District on their pleadings, "except as to [their] complaint for declaratory relief as it relates to the issue of responsibilities for revisions, updates, or changes to the existing fish protection screens and as to that cause, it is DISMISSED, WITHOUT PREJUDICE, as premature." The Department of Fish and Game (now the Department of Fish and Wildlife), together with the State Water Board, were the defendants in the complaint for declaratory relief, but, as noted, this appeal concerns only the State Water Board's adoption of RD-1644.

4

As noted, the trial court rejected the District's and Cordua's challenges to RD-1644 (with a certain exception regarding declaratory relief—see fn. 1, *ante*), and entered judgment for the State Water Board.

The District, but not Cordua, appealed.

## DISCUSSION

### I. The District's CEQA Challenges to RD-1644 Are Moot

The District contends the State Water Board should have prepared an EIR regarding RD-1644. As noted, in adopting RD-1644, the State Water Board issued a notice of exemption from CEQA.

Specifically, the District maintains that RD-1644 encompassed the following environmental impacts: Additional groundwater pumping; less water for waterfowl habitat; impacts of colder water temperature requirements on rice production, recreation, and other biological resources; and impacts to hydroelectric power generation and replacement of clean energy sources with dirtier ones.

All of these alleged environmental impacts, however, are based on, or directly relate to, RD-1644's instream flow requirements. Those requirements, as we have seen, have been superseded by new instream flow requirements in WR 2008-14. Consequently, as we shall explain, the District's CEQA claims are moot.

A case is moot when a court's decision "can have no practical impact or provide the parties effectual relief." (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.) Mootness is typically found in cases where, as here, there is a substantive change to the challenged law, order, or decision after the litigation is filed. (See, e.g., *Arnold v. California Exposition and State Fair* (2004) 125 Cal.App.4th 498, 503 [new contract that replaced challenged contract rendered issue moot]; *East Bay Mun.*

5

*Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1131-1132 [change in challenged policy rendered case moot]; *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 704-705 [change to challenged general plan provision rendered issue moot].) In short, the relevant environmental impacts to be analyzed under CEQA are those based on the WR 2008-14 instream flow requirements rather than those based on the RD-1644 instream flow requirements. WR 2008-14 has mooted RD-1644 regarding the District's CEQA claims.[2]

The District raises three related points to argue that a CEQA analysis of RD-1644 is still required.

First, the District zeroes in on the mootness requirement that the order or decision being challenged must have been *substantively* changed. The District asserts that WR 2008-14 only "slightly modified" RD-1644's instream flow requirements.

The record shows otherwise. The trial court accurately characterized WR 2008-14 as "completely supersed[ing]" the instream flow requirements of RD-1644. In numerically examining the range of instream flow requirements from drier to wetter years at the most relevant measurement point (the Marysville Gage)—in terms of cubic feet per second for various times of year—the record, as represented by the chart below, shows the following matchups between RD-1644 and WR 2008-14:

---

[2] As noted, a joint EIR/EIS was prepared for WR 2008-14, and the District did not challenge that environmental document.

6

| INSTREAM FLOW REQUIREMENTS (MARYSVILLE GAGE)* | | |
|---|---|---|
| PERIOD | RD-1644 | WR 2008-14 |
| OCTOBER 15-APRIL 15 | 400–500 | 350–1,000 |
| LATTER MAY | 500–1,100–1,500 | 400–1,000–2,000 |
| LATTER JUNE | 500–800–800 | 150–500–1,500 |
| JULY AND AUGUST | 250–250 | 150–500–700/600 |
| SEPTEMBER | 250 | 350–500 |
| * *Figures represent cubic feet per second, as measured from drier to wetter years.* | | |

And, qualitatively speaking, the central difference between RD-1644 instream flow requirements and those of WR 2008-14 has been described as "a shift from a flow regime with higher spring flows and lower summer flows, to a flow regime with lower spring flows and higher summer flows."

By any definition of the word "substantive," then, the instream flow requirements of WR 2008-14 are "substantively" different from the instream flow requirements of RD-1644. So, again, the relevant environmental impacts are those based on the WR 2008-14 flow requirements rather than those based on RD-1644, and the District's CEQA challenges to RD-1644 are therefore moot.

The District's second point against mootness is similar to its first, and therefore meets a similar fate. The District laments that a "lead agency whose project is challenged [under CEQA] would be encouraged to slightly modify the project in an attempt to moot the pending challenge and gain a litigation advantage." The District continues: " In [the present proceedings], [this would require] [the District] to file an action challenging [the Water Agency's] Yuba Accord EIR simply to preserve its [timely filed and pending] challenge to RD-1644, despite not having objections to the [Yuba Accord EIR]."

7

Again, this argument stumbles on its fulcrum, "slightly modify." In any event, to preserve its claim, a plaintiff need only *supplement* its complaint with the facts that have occurred since its original complaint. (Code Civ. Proc., § 464, subd. (a).)

That brings us to the District's third and final point against mootness. The District argues, "It matters not, in considering [the State Water Board's] compliance with CEQA, whether the instream flow requirements are those established by RD-1644, or WR 2008-14, or some other instream flow regime. What matters is that no environmental review was conducted to analyze the environmental impacts of *any* new instream flow regime when compared to the pre-RD-1644 environmental baseline [the District claims the EIR for the WR 2008-14/Yuba Accord used the RD-1644 flow regime as its environmental baseline]. [¶] The significance of a project's impacts can be ascertained only if the agency first establishes the physical conditions against which those impacts are to be measured."

Once again, though, the relevant environmental impacts to be analyzed are those based on the substantively different instream flow requirements of WR 2008-14 rather than those based on RD-1644. In the end, CEQA is about evaluating and mitigating a project's environmental impacts; the evaluation and mitigation of RD-1644's instream flow environmental impacts has been rendered moot by WR 2008-14.

## II.  The District's CEQA Challenges to RD-1644 Are Barred by CEQA's Ongoing Project Exemption

Lest any of the District's CEQA challenges to RD-1644 survive mootness, another legal hurdle ensures their demise: CEQA's exemption for ongoing projects.

Public Resources Code section 21169 of CEQA sets forth the ongoing project exemption, stating, as pertinent, "Any project . . . undertaken, carried out or approved on or before the effective date of this section [(Dec. 5, 1972), which covers the Development Project,] . . . notwithstanding a failure to comply with this division [(i.e., CEQA)], if

8

otherwise legal and valid, is hereby confirmed, validated and declared legally effective. . . .”

Two decisions provide clear guideposts for determining whether CEQA's ongoing project exemption applies here: *Nacimiento Regional Water Management Advisory Com. v. Monterey County Water Resources Agency* (1993) 15 Cal.App.4th 200 (*Nacimiento*) and, a decision from this court, *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931 (*County of Amador*), which we discuss in turn.

In *Nacimiento*, a government agency built a dam before CEQA was enacted. The dam was built to store and release water for various users. The *Nacimiento* court held that the agency's annual decision to release varying amounts of water to these various users was part of an "ongoing project" and exempt from CEQA. (*Nacimiento*, *supra*, 15 Cal.App.4th at pp. 201, 204-208.) The agency in *Nacimiento* neither expanded nor enlarged the dam to divert water, nor revised its procedures or standards for releasing water; the agency simply operated the dam within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions. (*Id.* at p. 207; see also *id*. at p. 205.) *Nacimiento* set forth the following test for determining whether CEQA's ongoing project exemption applies: "Whether an activity requires environmental review depends upon whether it expands or enlarges project facilities [(exemption inapplicable)] or whether it merely monitors and adjusts the operation of existing facilities to meet fluctuating conditions [(exemption applies)]." (*Nacimiento*, at p. 205.)

In marked contrast to *Nacimiento* stands *County of Amador.* In *County of Amador*, an irrigation district bought a hydroelectric project from a utility company. As operated by the utility, the project did not provide consumptive water uses. The irrigation district changed the focus of the project to provide consumptive water use for irrigation purposes. We concluded that this change by the irrigation district did not fall within the

9

ongoing project exemption and thus required CEQA review.  (*County of Amador*, *supra*, 76 Cal.App.4th at pp. 968-969; see also *id*. at p. 967.)

Applying these two decisional guideposts, we conclude the present case is akin to the situation described in *Nacimiento*; therefore, CEQA's ongoing project exemption applies.  The Development Project's original approved uses, as noted, were for flood control, irrigation, recreation, fishery protection and enhancement, and power production.  And, as the trial court pointedly noted in its statement of decision, "no party challenged the [State Water Board's] position that 'the flow requirements specified in RD-1644 are well within the historic range of what has existed on the lower Yuba River' since reservoir construction was completed in 1970."  Thus, RD-1644 neither expanded nor enlarged the Development Project's facilities to divert water, nor revised the regulatory procedures or standards for releasing water.  RD-1644 simply operated the Development Project within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions.  Consequently, CEQA's ongoing project exemption applies to RD-1644.[3]

### III.  Taking of Property and Impairment of Contract

The District contends that RD-1644's increased instream flow requirements unconstitutionally take portions of its water rights without just compensation and, in parallel fashion, unconstitutionally impair its water supply contract.

Again, since WR 2008-14 has completely superseded RD-1644's instream flow requirements, these contentions are now moot.  We cannot provide effectual relief to the District on these contentions because, in light of WR 2008-14, the amount of just compensation—based on the unconstitutional taking or impairment allegedly effectuated

---

[3]  Given this conclusion, we need not consider whether the State Water Board also properly relied on certain categorical CEQA exemptions in adopting RD-1644.

10

by RD-1644's instream flow requirements—is no longer an issue. As we have seen, a case is moot when a court's decision cannot "provide the parties effectual relief." (*Woodward Park Homeowners Assn. v. Garreks, Inc.*, *supra*, 77 Cal.App.4th at p. 888.)

## IV. Public Trust Doctrine

As legal authority for adopting RD-1644, the State Water Board relied in part on the public trust doctrine, a doctrine that protects water resources including fish. (See, e.g., *Golden Feather Community Assn. v. Thermalito Irrigation Dist.* (1989) 209 Cal.App.3d 1276, 1283-1284 [in general, the public trust doctrine posits that the state holds all navigable waters and the lands beneath them in trust for the public purposes of navigation and fishery]; *California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 630 [a variety of public trust interests also pertain to non-navigable streams that sustain a fishery] (*California Trout*); see also *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 445-447 [setting forth the framework by which the public trust doctrine and the California appropriative water rights system must accommodate one another and operate simultaneously].)

The District maintains that the State Water Board may not, under the public trust doctrine, appropriate water storage facilities to *enhance* public trust resources, such as fish, by mandating operational conditions that would not exist in the state of nature at the time of statehood, without just compensation to the owner and beneficiaries of those facilities.

As the trial court aptly recognized, however, "[o]nce again, at the center of this argument is the concept that the [State Water Board] is 'taking' [the District's] water since it is the 'taking' that will create the new fish habitat [on the lower Yuba River];" and since the "taking" argument, for the reasons discussed above, is moot, so too is the District's argument that RD-1644 exceeded the public trust doctrine.

11

The District disagrees this issue is moot. As the District sees it, "[t]he fact that the [State Water Board] invoked the public trust [doctrine] to require unnatural flows is determinative; it is irrelevant whether those unnatural flows are those set forth in RD-1644, [or in] WR 2008-14, or some other flow regime that never existed in the state of nature." The District adds that its "public trust contention extends beyond reliance only on RD-1644's instream flow requirements. The [State Water Board] inappropriately invoked the public trust doctrine to require cool water temperatures [and, in effect, an artificial fish hatchery] that did not exist in the state of nature for the Lower Yuba River."

We are not persuaded. As the District emphasizes in its reply brief, "At issue in this case is whether the public trust doctrine can be used to [require certain releases from water storage facilities], *without compensation*, to provide environmental enhancements that would not exist in the state of nature at time of statehood." (Italics added.) It is this central feature of *compensation*—the nitty-gritty of quantifying dollars—that has rendered the District's public trust doctrine issue moot, for the reasons explained above in the "taking' discussion (and recognized by the trial court). Furthermore, the requirements of cooler water temperatures and a fish hatchery do not alter this conclusion of mootness by purportedly presenting issues distinct from instream flow requirements, because these temperature and hatchery requirements flow directly from the instream flow requirements.

Moreover, the nonpecuniary feature of the District's public trust doctrine argument—limiting the doctrine to the state of nature at the time of statehood—is questionable. For example, Fish and Game Code section 5937, which has been recognized as a legislative expression of the public trust doctrine protecting fish as trust resources, provides, in part, "The owner of any dam shall allow sufficient water . . . to pass over, around or through the dam, to keep in good condition any fish *that may be*

12

*planted* or exist below the dam." (Italics added.) (See *California Trout*, *supra*, 207 Cal.App.3d at pp. 626, 631.)

## V. Procedural Due Process

Finally, the District claims the State Water Board's procedure in adopting RD-1644 violated due process in two ways: First, given the starts and stops in the hearings during the long period of RD-1644's adoption, no hearing officer or State Water Board member considered all of the evidence; and, second, a State Water Board staff member in charge of fishery issues, who formerly worked for the Department of Fish and Game (now, the Department of Fish and Wildlife), was a prejudiced advocate with intimate knowledge of issues regarding Yuba River flows.

The District makes these due process claims on its own behalf. It cannot do so. This is because the District is a political subdivision of the state—a "creature" of the state. As such, it has no due process rights that it may assert in opposition to the will of its creator; constitutional rights are intended to limit governmental action vis-á-vis individual citizens, a status the District cannot invoke. (*Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6; *Board of Supervisors v. McMahon* (1990) 219 Cal.App.3d 286, 296-297; *Santa Monica Community College Dist. v. Public Employment Relations Bd.* (1980) 112 Cal.App.3d 684, 690; contra, *Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 630 [a political subdivision of the state may challenge the constitutionality of a statute on behalf of its constituents, where the constituents' rights under the challenged statute are " 'inextricably bound up with' " the political subdivision's duties under its enabling legislation].) The District has no standing to raise these two due process claims.

13

**DISPOSITION**

To the extent the appeal is moot, or the District lacks standing to bring the appeal, it is dismissed. To the extent the appeal is not dismissed, the judgment is affirmed. Respondents State Water Board and Department of Fish and Wildlife are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                           BUTZ             , J.


We concur:


ROBIE          , Acting P. J.


MAURO          , J.

14